J-A27046-25
J-A27047-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SIGMAPHARM LABORATORIES LLC, I3PHARMACEUTICALS, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RAKESH GROVER, LAI OGUNBIYI, ISHARI PIYA SHRESTHA, SUNIL SAGI, AND RAM KALLUR, | : | |
| | : | |
| v. | : | |
| | : | |
| SIGMAPHARM LABORATORIES, LLC, AND SPIRIDON SPIREAS | : | |
| | : | |
| APPEAL OF: SIGMAPHARM LABORATORIES LLC | : | No. 3116 EDA 2024 |

Appeal from the Judgment Entered November 4, 2024
In the Court of Common Pleas of Bucks County
Civil Division at No(s):  2014-06777

| | | |
|---|---|---|
| SIGMAPHARM LABORATORIES LLC, I3PHARMACEUTICALS, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RAKESH GROVER, LAI OGUNBIYI, ISHARI PIYA SHRESTHA, SUNIL SAGI, AND RAM KALLUR, | : | |
| | : | |
| v. | : | |
| | : | |
| SIGMAPHARM LABORATORIES, LLC, AND SPIRIDON SPIREAS | : | |
| | : | No. 3117 EDA 2024 |
| APPEAL OF: SPIRIDON SPIREAS | : | |

Appeal from the Judgment Entered November 4, 2024
In the Court of Common Pleas of Bucks County
Civil Division at No(s):  2014-06777

J-A27046-25
J-A27047-25

BEFORE:  BOWES, MURRAY, and BECK, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED JUNE 3, 2026**

Sigmapharm Laboratories, LLC ("Sigmapharm"), and its chairman and chief executive officer ("CEO"), Spiridon Spireas, separately appeal from the judgments entered against them and in favor of Rakesh Grover, Lai Ogunbiyi, Ishari Piya Shrestha, Sunil Sagi, and Ram Kallur (collectively the "Former Employees"), following a jury trial on multiple claims and counterclaims.[1]  In Sigmapharm's appeal, the judgments are affirmed in part, reversed in part, and vacated in part, and we remand for a new trial on the Former Employees' damages for breach of written contracts.  For Spireas's appeal, the judgment is affirmed in part and vacated in part, and we remand for a new trial on the Former Employees' claim for breach of fiduciary duty.

## I.    Facts and Procedural History

This story begins at Long Island University ("LIU") in the 1990s.  Spireas was a professor who taught and mentored Grover, Shrestha, Sagi, and Kallur in their graduate studies in pharmaceutics.  Spireas later recruited the four of them to work at Mutual Pharmaceuticals ("Mutual"), where Spireas was Vice President ("VP") of Research and Development ("R&D") and Ogunbiyi was VP

---

[1] Although we have not included titles or post-nominals in identifying and discussing the individual parties to this appeal, all of them hold advanced degrees, including doctorates earned by Spireas, Grover, and Ogunbiyi.

of Business Development. Spireas had aspirations of forming his own company. He often chatted with the Former Employees about coming to join him if he did, promising each a five to ten percent ownership stake in the yet-to-be-formed enterprise. They had these discussions "[a]ll the time," although "not [with a] great deal" of specifics. *See* N.T. Trial, 4/16/24, at 33.

While Grover thrived and was promoted within R&D, Mutual removed Spireas in the spring of 2004, creating a department for him without subordinate employees. Spireas, displeased at the prospect of being replaced by his student, urged Grover to leave Mutual. Grover complied in July 2004, taking a pay cut to go to elsewhere. Mutual fired Spireas that autumn, and terminated Ogunbiyi shortly thereafter for refusing to "say something that was not complimentary of . . . Spireas." N.T. Trial, 4/19/24, at 123. Kallur resigned and took a new position in February 2005. Sagi left his full-time position at Mutual in June 2005, but continued part time for a few months. Shrestha was the last to leave, moving to another pharmaceutical company in August 2005.[2]

---

[2] As described by Kallur, the Former Employees took positions at other companies in furtherance of Spireas's plan to start his own company with the Former Employees as co-owners, since, due to a non-compete agreement, Spireas was unable to hire them directly from Mutual. *See* N.T. Trial, 4/18/24, at 37.

Spireas founded Sigmapharm in February 2005. He and his wife were the two Initial Members.[3] Pursuant to its Operating Agreement, Sigmapharm was established as a manager-managed limited liability company ("LLC").[4] The Operating Agreement identified Spireas as the initial Chairman and CEO of Sigmapharm, along with his wife as Executive VP and Secretary. Appointment of additional officers was at the discretion of the board of managers.

Sigmapharm had four classes of membership units. Series A units, issued only to the Initial Members, entitled them to vote and to receive a share of distributions of net operating cash flow and net proceeds of capital events.[5] Series B Units were to be issued to members in exchange for services rendered to the company, while a contribution of additional capital resulted in a member receiving Series C units.[6] Members holding Series B and C units were entitled

---

[3] As she is not a party and does not factor in the events at issue in this appeal, we decline to name Spireas's wife and further tax readers' memories.

[4] Our references to "Operating Agreement" are to the controlling Amended and Restated Limited Liability Operating Agreement executed on June 15, 2007, admitted at trial as Exhibit P-18.

[5] Essentially "net operating cash flow" meant net profits, while "net capital event proceeds" was defined as the net value realized from, *inter alia*, sale of Sigmapharm's assets or payment of insurance or other claims to the company. **See** Operating Agreement at ¶ 1.1.

[6] The Operating Agreement contained the caveat that no new Series B units could be issued if it would result in Series B units accounting for more than
*(Footnote Continued Next Page)*

to receive distributions of net operating cash flow and net proceeds of capital events, but Series B and C units carried no voting rights during the lifetimes of the Initial Members.[7]  Upon the occurrence of a "conversion event," which was a termination of the Agreement for any reason other than death, disability, retirement, or cause, a member's Series B units would convert to Series D units.[8]  Series D units were eligible for net proceeds of capital events, but had no voting rights and no entitlement to distributions of net operating cash flow.

Upon the occurrence of an "event of dissociation," which included the resignation or removal of a person as a member, the voting member with the largest ownership interest in Sigmapharm, or the company itself, had the

_____

10% of all units.  *See* Operating Agreement at ¶ 4.3(a).  Spireas indicated that, in this respect, he modeled Sigmapharm after Mutual, which allocated up to a total of 5% employee equity in the company.  However, he elected to double the cap on employee ownership.  *See* N.T. Trial, 4/9/24 (Spireas Vol. 1), at 46.

[7] The Operating Agreement provided that when both Initial Members become deceased, all Series B and Series C units automatically will convert to voting units.  *See* Operating Agreement at ¶ 4.14(b).  In other words, once Spireas and his wife are dead, Sigmapharm's capital contributors and employees will have the right to vote on the management of the company in accordance with the number of B and C units they hold.

[8] The conversion rate was to be the number of years up to twenty that the employee member worked for Sigmapharm divided by twenty.  For example, an employee with 100 Series B units would receive 100 Series D units if he worked for the company for twenty or more years, but would get only twenty-five or fifty Series D units if leaving after five or ten years, respectively.  This is the twenty-year-vesting provision discussed *infra*.

option to purchase some or all of the dissociating member's units at a price derived from the adjusted net book value of the company as of the date of dissociation. *See* Operating Agreement at ¶¶ 1.1 (defining "event of dissociation"), 11.7(b), 11.8. In the absence of such election by the primary voting member or the company, the dissociating member's interests would convert to Series D units. *Id*. at ¶ 11.8(e).

Sigmapharm was initially a one-man operation in Spireas's basement. In mid-2005, Spireas began receiving royalties as a result of Mutual winning a lawsuit that permitted it to launch a product developed by a company in which Spireas was a partner.[9] This influx of cash enabled Spireas to loan money to Sigmapharm to lease a property for a laboratory and to hire employees. All told, Spireas loaned Sigmapharm approximately $29 million at 6% interest to fund the company while it operated in the red.

Ogunbiyi was the first of the Former Employees to begin working for Spireas at Sigmapharm, initially as a consultant for another company owned by Spireas. Fearing that his current employer was going to require him to relocate, Grover reached out to Spireas in the spring of 2005, prompting Spireas to advise him to "come make a company" together. *See* N.T. Trial, 4/16/24, at 36. Spireas orally offered Grover a salary of $200,000, an initial

---

[9] Grover maintained that Spireas had made an oral promise in 2003 or 2004 to give Grover $2 million for his work on the product in question, but he never was paid and "was too shy to ask for [his] share." N.T. Trial, 4/16/24, at 37.

2-3% equity increasing up to 5% "after years of service," and a 3-4% share in profits.  ***Id***. at 39-40; Exhibit P-8.  There was no discussion of a vesting period for the equity or other topics such as non-compete provisions, at-will employment, or the consequences of for-cause termination.  ***Id***. at 117.

Grover accepted the offer and started as Sigmapharm's President in October 2005, with his job being to "br[ing] life in the company," including hiring employees, while Spireas handled the legal issues.[10]  ***Id***. at 41.  Spireas drafted the first offer letter, which he sent to Kallur on March 15, 2006, for the position of Director of Process Development and Technology Transfer.  The letter stated an annual salary plus "health benefits, profit sharing[,] and ownership of certain company equity in the form of stock units which shall be transferred to you over a period of three years."  Exhibit D-106.  The letter continued:

> To that end, please be advised that you shall be included in the First Tier of stock-holding Employees of our company and considered as one of the Founding Members of [Sigmapharm]. The number of units allocated to all First Tier Employees (Founding Members) shall be defined along with the exact number of stock units transferrable to you by the end of the third quarter of this year.

---

[10] According to Spireas, litigation is routine in the generic pharmaceutical industry, as brand companies seek to keep generic drugs off the market by suing and claiming patent violations.  ***See*** N.T. Trial, 4/10/24 (A.M.), at 43-44; N.T. Trial, 4/12/24 (Spireas Vol. 6), at 81-82.

*Id*.  Grover used this template in letters offering Shrestha the position of Manager of Product Development and Sagi to become the Director of Technology Development.  *See* Exhibits D-107 and D-115.  They accepted and all the Former Employees were working together at Sigmapharm by September 2006.

In doing so, most of the Former Employees left positions with stable companies and took pay cuts for the opportunity to work for their revered mentor.  *See*, *e.g.*, N.T. Trial, 4/16/24, at 35-36 (Grover explaining that loyalty to his professor motivated him to decline an offer of a VP title and $500,000 salary to stay at that company); N.T. Trial, 4/17/24, at 135 (Shrestha indicating that her offer was "way lower" than what she was making at Par); N.T. Trial, 4/18/24, at 37-38 (Kallur stating that he left a better compensation package to go to Sigmapharm).  Their past success working together at Mutual, and the promise that they would all become owners in his company, made the potential upside worth the risk.  *See*, *e.g.*, N.T. Trial, 4/17/24, at 135 (Shrestha explaining:  "They told me you'll be a company owner.  You'll get some equity in the company.  So, please come and work as a team.  We did before at Mutual Pharmaceuticals.  We worked very hard.  We did very well over there.  So, come over here to work with us and we'll make this company big.").

The Former Employees worked at Sigmapharm without a written contract until October 2006, when Spireas, on behalf of Sigmapharm,

presented each Former Employee with a senior management Employment Agreement. The contracts, retroactive to each individual's start date, were personalized in stating the employee's title, annual salary, and number of Series B units to be granted upon the occurrence of certain events, but the agreements otherwise included the same terms.[11] For example, § 3 governed the employee's scope of services, requiring the devotion of full time and energy to the performance of assigned duties and prohibiting other employment. *See*, *e.g.*, Exhibit P-4 (Ogunbiyi Employment Agreement) at § 3. Compensation was detailed in § 4, providing as follows as to unit transfers:

> As additional consideration for this Agreement (the "Equity Compensation"), Employee shall be granted certain Series B units (as more fully described in [§] 9 below) representing a non-voting interest in the operating profits and future appreciation of the Employer, as more fully described in [§] 9 below. The Series B units shall be transferred to Employee on the dates and in the amounts set forth below, provided that (i) prior to receiving any Series B units, Employee executes a joinder to the . . . Operating Agreement prepared by the Employer and executed by all other members, which shall include, among other things, restrictions in the transfer of the Series B units, (ii) on each applicable date, this Agreement has not been terminated and is in full force and effect, and (iii) on each applicable date, Employee is not in default of any of the provisions of this Agreement:
>
> (1) Within ninety days from the date of execution hereof or the date of the annual meeting of the Company, 100 Series B units;
>
> (2) Within ninety days of receipt of the acceptance of a regulatory filing of an Abbreviated New Drug Application

---

[11] For Ogunbiyi and Grover, the effective date was October 31, 2005.

> ("ANDA") by the U.S. Food and Drug Administration ("FDA"), 400 Series B units;
>
> (3) Within ninety days of the first approval by the FDA of an ANDA a number of Series B units equal to 500 multiplied by a factor ranging from 0 and 1, as determined by the Board of Managers in its sole discretion[.]

*Id*. at § 4(b) (cleaned up).[12]

Confidentiality was the subject of § 5. It imposed upon the employee a fiduciary duty to Sigmapharm with respect to confidential information and required the employee to return all documents and other materials containing confidential information upon the cessation of employment. *Id*. at § 5(a)-(b). Section 6 stated non-competition and non-solicitation mandates, including a five-year post-employment prohibition against doing any drug formulation work with respect to a product sold anywhere in the world. *Id*. at § 6(c). Section 8 stipulated that all intellectual property created or developed while the Agreement was in effect belonged exclusively to Sigmapharm, and that the employee was obligated to execute any documents necessary to effectuate and enforce the company's rights. *Id*. at § 8(a)-(b).

---

[12] The stated numbers of units were the same for all Former Employees except Grover, who stood to receive 350, 1,400, and a multiplier of 1,750, respectively, for each triggering event. *See* Exhibit P-1 (Grover Employment Agreement) at § 4(b). To provide a sense of scale, Spireas received ninety Series A units and 51,210 Series C units for his capital contribution of $600,000. His wife's $400,000 yielded ten Series A units and 38,690 Series C units.

Provisions for the term and termination of the Employment Agreement were stated in § 7. Employment was expressly at-will, such that either party could terminate it at any time upon thirty days' notice. *Id*. at § 7(a). However, Sigmapharm had the right to end the employment with immediate effect and pay thirty-days' salary. *Id*. Termination for reasons other than cause was automatically triggered by the death or disability of the employee. *Id*. at § 7(b).

Significant to the instant appeal, § 7(c) of the Employment Agreement entitled Sigmapharm to terminate for cause, immediately upon notice and without any payment, for:

(i) any material breach of this Agreement by Employee or any Material Failure by Employee to perform his duties under this Agreement[;]

(ii) Employee's commission of fraud, embezzlement or other unlawful acts in connection with the business of the Employer[;]

(iii) Employee's indictment for any felony or crime involving moral turpitude[;]

(iv) a breach by Employee of his obligations under [§§] 5, 6 or 8 of this Agreement[;]

(v) any act by Employee that involves a willful conflict of interest with the Employer except as permitted by this Agreement[;] or

(vi) Employee's willful material misrepresentation to the members and managers of the Employer.

*Id*. at § 7(c) (spacing altered).

Also important to the issues before us, § 9 provided as follows concerning the employee's equity compensation:

(a) The Employer initially shall authorize 100,000 units in multiple series, which shall be subject to the terms of the . . . Operating Agreement. The Series B units shall be issued for the purpose of offering them as Equity Compensation pursuant to [§] 4 hereof and shall not carry any voting power, and shall contain limitations in the rights of the members to transfer the units.

(b) If this Agreement is terminated for cause pursuant to [§] 7(c) hereof or if Employee after termination of this Agreement is deemed by Employer in its reasonable discretion that he has violated [§§] 5, 6 or 8 hereof (the "Determination of Covenant Violation"), any units which have been issued to Employee under [§] 4 or [§] 9(c) hereof shall be transferred automatically to Employer for $1.00. . . .

(c) The termination of this Agreement for any reason other than death, disability, retirement, or cause, shall be referred to as a "Conversion Event." Upon the occurrence of a Conversion Event any Series B units which have been issued to Employee under [§] 4 shall be converted to a number of Series D units equal to the Series B units owned by the Employee at the time of the occurrence of the Conversion Event multiplied by a fraction having as numerator the number of years that the Employee worked at the Employer (rounded to the nearest full year) and as denominator the number 20. Any fractional shares resulting from this calculation shall be rounded to the nearest full number. . . .

(d) If this Agreement is terminated by reason of death, disability or retirement, the Employee shall retain all of the Series B Units which have been issued to Employee under [§] 4.

(e) Employer's right to repurchase any Series B units or Series D units which have been issued to Employee under [§] 4 or [§] 9(c) hereof in all circumstances (other than upon termination for cause or upon a Determination of Covenant Violation) shall be set forth in the . . . Operating Agreement.

*Id*. at § 9 (cleaned up).

Spireas reportedly presented the Employment Agreements to the Former Employees on a take-it-or-leave-it basis, giving them one week to sign it and refusing to consider altering any terms. *See*, *e.g.*, N.T. Trial, 4/16/24, at 46 (Grover: "Spireas told me that they have drafted a contract, and he and his wife have decided that they will not change a single word. If anybody wants to leave, they can leave."); *id*. at 183 (Sagi, same); N.T. Trial, 4/17/24, at 139 (Shrestha, same); N.T. Trial, 4/22/24, at 84-85 (Ogunbiyi, same). Nonetheless, Grover asked him to alter § 9(c) regarding the impact of a conversion event, and acknowledged that Spireas "gladly did" for all except Ogunbiyi. *See* N.T. Trial, 4/16/24, at 47-48. *See also* N.T. Trial, 4/9/24, at 71 (Spireas indicating that four of the Former Employees asked to keep their Series B units even if they left, but Ogunbiyi did not make the request so his Employment Agreement retained the version of § 9(c) stated above).

Accordingly, § 9(c) of the Employment Agreements for Grover, Sagi, Shrestha, and Kallur was modified to state as follows:

> Upon the occurrence of a Conversion Event[,] any Series B units which have been issued to Employee under [§] 4 shall be converted to a number of **Series B units (if the termination was initiated by the Employer without cause) or Series D units (if the termination was initiated by the Employee)** equal to the Series B units owned by the Employee at the time of the occurrence of the Conversion Event multiplied by a fraction having as numerator the number of years that the Employee worked at the Employer (rounded to the nearest full year) and as denominator the number 20.

- 13 -

Exhibit P-1 (Grover Employment Agreement) at § 9(c) (emphasis added to the altered language). Thus, if Sigmapharm should exercise its option to terminate the contracts of Grover, Shrestha, Sagi, or Kallur at-will, the employee would retain at least a fraction of his or her Series B units which, unlike Series D units, carried a right to share in distributions of profits, not just in the proceeds of a capital event.

Notwithstanding this alteration, the Former Employees remained unhappy about the variance between their oral discussions and the Employment Agreements. However, Spireas told them not to worry about the contracts, ensuring them that when Sigmapharm began to do well, he would take care of them and honor his promises. ***See***, ***e.g.***, N.T. Trial, 4/16/24, at 47 (Grover representing that Spireas said, "I will not enforce it, but please sign this agreement. I want to have it. If you sign, everybody else will sign."); ***id***. at 184 (Sagi stating that, "when we raised our concerns, he said that, guys, please listen to me. This is -- you are members of the company and don't worry about the contract. Trust me, I will take care of you when the company does well."); N.T. Trial, 4/22/24, at 84-85 (Ogunbiyi recounting that, in response to his complaints, Spireas said "when things get well and we do well in this company, I'll take care of it. I'll do what I promised.").

In any event, the Former Employees felt that they had no choice but to sign the Employment Agreements. Grover believed it was "not possible" to get another job at that point, being unable "to explain in a positive way" why

things did not work out at Sigmapharm. *See* N.T. Trial, 4/16/24, at 49. Sagi had just put down a non-refundable deposit on a home. *Id*. at 183. Shrestha, having a four-year-old son who was a U.S. citizen, was in the country on an H-1B visa and did not "know where to go and find a job immediately." N.T. Trial, 4/17/24, at 139. Ogunbiyi "felt trapped and pressured" because he was paying college tuition for three of his children. *See* N.T. Trial, 4/22/24, at 88.

Accordingly, each of the Former Employees signed the Employment Agreements in October 2006, thereby acknowledging that the writing "contains the entire Agreement of the parties and no amendments or modifications shall be valid, unless in writing and executed by all parties." *See*, *e.g.*, Exhibit P-4 (Ogunbiyi Employment Agreement) at § 11(c).

Disgruntled as they were, they continued their work. Their leader Grover described the months following the signing of the Employment Agreements as follows:

> We are building the company further and I had another difficult job now. All of us are scared to death, and every morning it was my job to bring all [the Former Employees] together, . . . and promising them let's continue working. Have trust in Spireas. I will go fight with him and we're going to get our share when the time comes. So, I rallied them on a daily basis, but this contract shook us apart completely. We started [second] guessing Spireas, but it was my job to tell them on a daily basis let's have faith. I know him. He's a very good man. I'm going to make him fulfill his promises.

N.T. Trial, 4/16/24, at 50 (titles omitted).

On June 18, 2007, Spireas sent an email to the Former Employees attaching Sigmapharm's Operating Agreement. The email advised them that each would receive certificates for the first installment of their company units as soon as they signed the joinder that he would distribute to them. ***See*** Exhibit P-20. The message concluded: "I am extremely pleased today since your ownership to this company is becoming a reality." ***Id***.

The Former Employees, on the other hand, were displeased. Not getting the greater equity percentages Spireas had promised "was very, very disappointing and heartbreaking." N.T. Trial, 4/17/24, at 142 (Shrestha). Further, they had never discussed a five-year non-compete restriction or the possibility of forfeiting all their units for $1. ***Id***. at 143 (Shrestha); N.T. Trial, 4/18/24, at 39-40 (Kallur). This joinder, like the Employment Agreement, was presented as non-negotiable. ***See*** N.T. Trial, 4/16/24, at 52 (Grover). Still relying upon Spireas's oral promises to take care of them and that they would "become millionaires," they signed the joinders and kept working despite the presence of a clause in the Operating Agreement expressly disclaiming the existence of any understandings not included therein.[13] ***See*** N.T. Trial, 4/15/24, at 33 (Grover); N.T. Trial, 4/17/24, at 166-67 (Shrestha).

_____

[13] The Operating Agreement's integration clause stated as follows:

> This Agreement, and the schedules hereto, constitutes the entire
> agreement between the Company and the Members with respect

*(Footnote Continued Next Page)*

There is no dispute that the Former Employees worked hard over the ensuing years to make Sigmapharm a financial success. Spireas was often absent from the workplace, but he called every day to speak with Grover, who joined the Board of Managers as chief operating officer ("COO") in 2009 or 2010. The Former Employees were happy with this arrangement of Spireas providing the financing and them running the company. ***See*** N.T. Trial, 4/16/24, at 54. Shrestha, Kallur, and Sagi developed Sigmapharm's products while Grover supervised them and, along with Ogunbiyi, made connections to further Sigmapharm's interests. ***Id***. at 60, 75-76.

In particular, Shrestha, Sagi, and Kallur worked on formulating the drugs and drafting the ANDAs to submit to the FDA. They labored long hours, often taking work home to do in the evenings and on weekends. ***See***, ***e.g.***, N.T. Trial, 4/16/24, at 165 (Sagi stating: "We worked in the evenings, on the weekends, holidays, all right. This was the practice that had been going on

_____

> to the subject matter hereof, and supersedes all prior and contemporaneous agreements, representations and understandings of the parties. *Provided, however*, that in the case of any conflict between this Agreement and the terms of the employment agreement between the Company and an Employee Member (if any), the terms of such employment agreement shall prevail. No party hereto shall be liable or bound to the other in any manner by any warranties, representations, or covenants with respect to the subject matter hereof except as specifically set forth herein.

Operating Agreement at ¶ 13.1 (italics in original).

since I joined Sigmapharm until I left in 2014."). For most of their tenure, Sigmapharm did not provide them with laptop computers or remote access to the worksite devices or email accounts. *Id*. at 139, 192; N.T. Trial, 4/17/24, at 73. Therefore, they would send documents to their personal email accounts, such as Gmail or Hotmail, so they would be able to work on them at home with their personal devices. *See* N.T. Trial, 4/16/24, at 192; N.T. Trial, 4/17/24, at 53-57, 69-70; N.T. Trial, 4/18/24, at 11. For large files, they used thumb drives. *See* N.T. Trial, 4/16/24, at 79, 192. They also used the thumb drives within the laboratory to share large documents with Grover for his review. *Id*. at 79. These practices were undertaken with Spireas's knowledge and tacit approval. *Id*. at 79 (Grover indicating: "We started learning, all of us, including . . . Spireas, that we will take documents in and out through a zip drive or thumb drive."), 192 (Sagi explaining that Spireas knew they were taking files home and they sometimes sent documents to Spireas's personal email); N.T. Trial, 4/18/24, at 204-05 (Kallur stating that Spireas knew they were taking documents to work on them at home).

Through the Former Employees' efforts, Sigmapharm averaged development of one or two products per year. *See* N.T. Trial, 4/16/24, at 85. Initially, there were no profits to be distributed to the unit holders. From 2006 through 2012, the company operated at a cumulative net loss of $25 million after paying the Former Employees' salaries. During this time, the company was kept afloat by Spireas's loans and additional capital infusions. *See* N.T.

Trial, 4/10/24, at 70; N.T. Trial, 4/18/24, at 73; Exhibit P-39. Spireas regularly told the Former Employees to stick with it, and that he would take care of them once Sigmapharm started making money.

In his capacity as President, Grover's focus was on increasing revenues. *See* N.T. Trial, 4/15/24, at 89. He led the selection of which drug products to develop, seeking to maximize profits by producing the generics that other companies were struggling to make. *See* N.T. Trial, 4/16/24, at 55-56. However, with an annual R&D budget of less than $2 million, Sigmapharm was limited to testing one or two drugs per year. *Id*. at 72. In order to increase productivity, Grover negotiated a lucrative deal with Azidus, an Indian company owned by Arumugam Olaganathan (known by the parties and referred to herein as "Mr. O") that ran the biostudies necessary for Sigmapharm to obtain FDA approval to sell its drugs. Pursuant to the agreement, instead of paying $300,000 to $400,000 per drug study, Azidus would conduct an unlimited number of studies for Sigmapharm drugs for a flat annual fee of $700,000. *Id*. at 68-69.

Grover also frequently explored working with other companies to produce generic drugs that Sigmapharm opted not to pursue due to budget constraints. *Id*. at 74-75. He only involved Spireas if discussions got serious because "95[%] of business deals do not go anywhere after preliminary discussions." *Id*. at 77. For example, Grover had discussions with Mr. O and his associates about partnering with the fledgling company Somnium, which

was considering setting up operations in the United States.  Grover described

the proposal as follows:

> [W]e give them some of the products that we could not -- we don't want to do it.  They put all of their money.  They'll give us the product.  Under Sigmapharm label, we sell it, and we give them 50[%] of the profits.   So, this will -- this will bring -- without doing anything from Sigmapharm, if we were successful, we would get a lot of other business.  That was the thought.

*Id*. at 73.  Grover was waiting to bring this opportunity to Spireas's attention

because Somnium was years away from being up and running, still needing

to establish a facility and pass an FDA inspection before it could commence

production.  *Id*. at 73-74.

A different opportunity came from Endo Pharmaceuticals ("Endo"), a

company that mainly manufactured brand pain management products such as

Percocet.  *See* N.T. Trial, 4/15/24, at 113; N.T. Trial, 4/16/24, at 76.  A broker

called Grover indicating that Endo wanted to meet to discuss collaborating

with, or possibly acquiring, Sigmapharm.   *See* N.T. Trial, 4/16/24, at 76.

Grover and Ogunbiyi met with Endo representatives who had heard of

Sigmapharm's reputation for developing a good product and scoring a victory

on a patent challenge.  *Id*. at 76-77.  They were interested in Sigmapharm's

existing revenues and projections for the upcoming five years from products

that were in its pipeline.  *See* N.T. Trial, 4/15/24, at 114.  Grover and Ogunbiyi

responded:  "[W]e don't know.  We are scientists." N.T. Trial, 4/16/24, at 77.

The broker then sent Grover a template for ascertaining the requested

information to further the discussions. The Former Employees got together, "tried to fill out the form[,] and learned a lot about" Sigmapharm's future potential, but never shared the document with Endo or the broker. *Id*.; N.T. Trial, 4/15/24, at 115-16. Grover and Ogunbiyi had another meeting with Endo at which it became apparent that they did not share a common vision for Sigmapharm's potential growth. *Id*. Grover never heard from them again and never received an offer he deemed worthy of Spireas's involvement.

During the unprofitable years, the Former Employees were nonetheless compensated in accordance with their Employment Agreements. They also received tranches of Series B units in a manner consistent with their offer letters, the Employment Agreements, and the Operating Agreement, but not the 5% to 10% they had discussed at Mutual. Specifically, Sigmapharm's board issued Series B units to the Former Employees in 2007, 2008, and twice in 2009. *See* N.T. Trial, 4/18/24, at 76-79. Collectively, they held a 7.67% share of all outstanding Sigmapharm units, with Grover reaching a 3.58% ownership interest and the other four each holding 1.02%. *See* Exhibit P-332a.

The company finally turned the corner in 2013, netting $10.6 million in profits. *See* N.T. Trial, 4/18/24, at 170. Sigmapharm paid most of the Former Employees bonuses of $50,000, and Grover received twice that amount. *See* N.T. Trial, 4/16/24, at 108, 146; N.T. Trial, 4/17/24, at 45; N.T. Trial, 4/18/24, at 7. The Former Employees' salaries also increased, such that

Grover's compensation was $400,000 per year and the others $200,000 or more. *See* N.T. Trial, 4/15/24, at 58; N.T. Trial, 4/17/24, at 24; N.T. Trial, 4/22/24, at 10. The company further made a distribution of over $9 million of net operating cash flow to Sigmapharm's unit holders the following year. *See* N.T. Trial, 4/19/24, at 31. A high point in Sigmapharm's productivity then came in June 2014, when, after all five Former Employees stayed at the laboratory for forty hours straight, they submitted four ANDAs in a single day. *See* N.T. Trial, 4/16/24, at 85. Spireas recognized this as "a huge achievement." N.T. Trial, 4/11/24, at 55.

Given these successes, the Former Employees deemed it the right time to press Spireas to make good on his promises. They met with Spireas on July 3, 2014, and asked him to revise their contracts. *See* N.T. Trial, 4/16/24, at 85. In particular, they wanted to change the twenty-year term for full vesting of their Series B units to the industry's "normal" three-to-five year period. *Id*. They also opposed the provision that allowed their termination on thirty-days' notice. *Id*. Spireas indicated that he would take the matter under advisement and get back to them. *Id*.

Spireas met with the group again and proposed giving them immediate bonuses and increased salaries, but leaving the equity for a later time.[14] *Id*.

---

[14] Specifically, Spireas proposed to take an annual salary of $800,000, to pay Grover $600,000 per year, and to implement salaries of $400,000 for the other four Former Employees. *See* N.T. Trial, 4/16/24, at 87.

at 87. Grover indicated that, rather than bonuses, they wanted the security of having the shares of the company that they had been promised. *Id*. at 87, 89. Spireas suggested that the Former Employees "go to a lawyer and have him reframe what you really want." N.T. Trial, 4/22/24, at 116. Some additional negotiations preceded the involvement of lawyers, giving the Former Employees the impression that things were "coming along," with Spireas offering greater equity percentages, but still not as high as they wanted. *Id*.

Through the suggestion of a friend of Grover, the Former Employees retained Ohio attorney Jeffrey F. Peck. *See* N.T. Trial, 4/16/24, at 86. On September 2, 2014, Peck called and emailed Spireas to advise him that he would "be the sole person negotiating on behalf of all five [Former Employees]" and to "request that neither [Spireas] nor [his] counsel attempt to engage on behalf of [him]self or Sigmapharm in any discussions with any of them regarding these matters." Exhibit P-184. The two spoke on the phone the next day, and on September 5, 2014, Peck sent Spireas a six-page letter to: (1) "outline points for the restructuring of" the Former Employees' Employment Agreements and Sigmapharm's Operating Agreement in order to give them an "ability to participate in the management, profits and increased value of the Company," since its past and future success and growth was attributable to the Former Employees' contributions; and (2) "itemize

documents and information required by the [Former Employees] in connection with the restructuring." Exhibit P-187 at 1.

The restructuring points were numerous and significant. We offer the following non-comprehensive summary. First, the Former Employees wanted 30% of the voting units in Sigmapharm and any present or future subsidiaries, with Grover holding 10% and the others 5% each, and profits to be distributed in accordance with these percentages without preferential distributions to members holding Series A and C units. *Id*. at 2, 4. They also sought 30% of the positions on Sigmapharm's board of managers, with a supermajority of 85% of the board necessary to approve all significant transactions and decisions, such as employment of officers, settling with brand companies, and "all non-business expenditures by the Company (including, but not limited to, political contributions, sporting event or team support, advertising, charitable contributions, and payment to non-Sigmapharm personnel)."[15] *Id*.

The Former Employees next asked for veto power over the issuance of additional Series A, B, or C units or the creation of new classes of units, and assurances that they would never be required to make capital contributions to Sigmapharm. *Id*. at 3. They further wanted the right to request a buy-out of their units and an established procedure for valuation of the units. *Id*.

---

[15] The impetus for this final category becomes clearer *infra*.

Additionally, the Former Employees wished to eliminate the employment-at-will provision of their Employment Agreements and limiting for-cause termination to a conviction for a felony or crime of moral turpitude. *Id*. at 4. They requested to reduce their non-solicitation and non-compete agreements to apply for only two years after termination and confine them to Sigmapharm products, to eliminate all restrictions on investing in other businesses, and to make it clear that their duties regarding Sigmapharm's intellectual property rights ceased after selling their units. *Id*.

The Former Employees sought to receive 2014 year-end bonuses of $800,000 to Grover and $400,000 to the others, based upon the parties' prior negotiations and "the current projections that the Company will earn profits of at least $20 million over and above $10 million retained working capital for 2015[.]" *Id*. at 5. Moving forward, they wanted the right to monthly income statements and expense reports, twice-annual audits of Sigmapharm's financial records, and copies of Sigmapharm's federal and state tax returns. *Id*. at 3-4. In the meantime, they asked to inspect the company's 2005 through 2013 tax returns and complete financial records including a list of assets, check ledgers, loan documents, security agreements, deposit and expense journals, and monthly and annual income statements and balance sheets. *Id*. at 5-6.

On September 16, 2014, Spireas called Grover and asked him to put together a list of all his work contacts, something Spireas had asked Grover

to do in the past in preparation to terminate an employee. *See* N.T. Trial 4/16/24, at 91. Grover spoke with the other Former Employees before texting Spireas to request a meeting. *Id*. at 92. Accordingly, the following afternoon, Grover, Shrestha, Sagi, and Kallur met with Spireas in his office.[16]

According to Spireas, the interaction began with talking about "business stuff" before the Former Employees suddenly announced that Grover was their spokesperson and launched into a discussion of the points raised in the Peck letter. *See* N.T. Trial, 4/10/24 (P.M.), at 15. Spireas asked that they be patient while he waited for his lawyers and they would all "sit down and negotiate." *Id*. at 16. Shrestha then informed him that they were not going to report to him until he satisfied all their demands. *Id*. Upset, Spireas said he did not want to discuss it given Peck's admonition not to negotiate with them directly and left to smoke a cigarette. *Id*. at 16-17. Grover went with him, insisting that they wanted everything outlined in the Peck letter. *Id*. at 17. Grover informed Spireas that, otherwise, there was an Indian company

---

[16] Ogunbiyi did not attend because he was in Nigeria, his native country, attending his daughter's wedding. She worked there for Ogunbiyi's brother at a company called Signal Health. Ogunbiyi had a U.S. company also called Signal Health, which he had formed in 2012, then in his 60s, to focus on shipping products to Africa after he retired. *See* N.T. Trial, 4/19/24, at 135-37. However, Ogunbiyi got started early, utilizing his Signal Health entity to facilitate his brother's acquisition of hepatitis B vaccines from Merck for use by a Nigerian state government. *See* N.T. Trial, 4/2/24, at 17-31.

that was willing to give Grover $1 million to run its U.S. subsidiary, and that Grover would take "[his] team" and go. *Id*.

The Former Employees paint a different picture of how things went. In their version, they informed Spireas that they were having a hard time concentrating on the work during the ongoing negotiations. *See* N.T. Trial, 4/16/24, at 92. Grover questioned whether Spireas was going to fire him, and Spireas said he did not want to answer that question. *Id*. Things became unpleasant, with Spireas bemoaning that he was the one that put the team together, and the Former Employees insisting that it was their hard work that built the company. *Id*. at 92-93. Grover brought up the $2 million that Spireas promised but never paid from the Mutual royalties, and Spireas said he did not want to talk about that in front of the others. *Id*. at 93. Grover accompanied Spireas on his smoke break and said he would pay Grover the $2 million when the contract renegotiation was resolved. *Id*. at 94.

The Former Employees maintained that none of them refused to report to Spireas or said they would walk out if he did not give them everything requested in the Peck letter. *Id*. at 93; N.T. Trial 4/17/24, at 21, 85. While Grover "did tell [Spireas] one time" that he had been approached a few years earlier about being the president of another company, he did not threaten to take the team to an Indian company. *See* N.T. Trial, 4/16/24, at 94. Rather, they resumed work the next day as if nothing had happened. *Id*.

On September 18, 2014, Spireas and his wife executed a resolution removing Grover from the Sigmapharm board of managers. *See* Exhibit D-243. The following week, on September 26, 2014, Sigmapharm: (1) escorted all present Former Employees off the property after serving them with notice that they were immediately being terminated for cause and forfeiting their units, and (2) sued them for breach of contract and other claims.[17]

The termination letters all cited material breaches of § 6(b) of the Employment Agreements, which prohibited them from influencing others to terminate or alter the agreements with Sigmapharm, and § 3(a), requiring them to perform the duties assigned to them by Spireas as company chairman and CEO. *See*, *e.g.*, Exhibit P-200 at 1 (Grover termination letter). The letters provided that the grounds fell within the § 7(c) definition of termination for cause, and thus triggered § 9(b)'s automatic transfer of all the Former Employees' units to the company for $1. *Id*. at 2. Further, the Former Employees were reminded to honor their § 6 non-compete duties, as well as their § 5 obligations to maintain confidentiality and return all materials in their possession containing confidential information. *Id*. at 2-3.

As for the lawsuit, Sigmapharm initially alleged a count of breach of contract and breach of the duty of loyalty for the Former Employees' failing to

_____

[17] Ogunbiyi was still in Nigeria at the time, and Shrestha was observing a holiday.

report as Spireas requested, influencing each other to alter their Employment Agreements, and not devoting their full time and energy to their jobs. Upon the assumption that they had or would be moving to a competitor as Spireas claimed Grover had threatened, Sigmapharm additionally pled a count of misappropriation of trade secrets. *See* Complaint, 9/26/14, at 13-17. Sigmapharm later amended its complaint to allege that a forensic examination of the Former Employees' company devices suggested that they had extracted a large volume of Sigmapharm's confidential information and trade secrets and improperly engaged in, or failed to tell Spireas about, communications, transactions, and business opportunities with Endo, Mr. O, Azidus, and Somnium. Thus, Sigmapharm augmented its breach of contract and misappropriation of trade secrets claims, and added counts of breach of fiduciary duty, fraudulent misrepresentation, and civil conspiracy. *See* Amended Complaint, 4/6/16, at 25-46, 49-50, 54-55.

The Former Employees responded with an answer, new matter, counter-claims, and third-party complaint against Spireas. Therein, they denied all wrongdoing alleged in Sigmapharm's complaint and averred that it could not enforce the contracts because they were signed under duress. *See* Answer, 1/12/15, at 13. The final, operative pleading alleged claims for breach of

fiduciary duty against Spireas,[18] violation of the Wage Payment and Collection Law ("WPCL"), fraudulent inducement, unjust enrichment, and two counts of breach of contract against both Sigmapharm and Spireas. The first contract claim asserted breach of the Employment Agreements, asserting that there was no justification to terminate them for cause and deprive them of their equity interests. *See* Second Amended New Matter, 6/30/17, at 11. In the alternative, they also alleged breach of oral agreements against Sigmapharm for refusing to provide the amount of equity they promised at the outset of their employment and multiple occasions thereafter. *Id*. at 12-13.

Both sides filed petitions for preliminary injunctions. Sigmapharm sought a court order preventing the Former Employees from working for competitors and from retaining or disclosing any confidential information in their possession. The Former Employees asked the court for relief from the five-year, worldwide non-compete provision on the basis that it was unreasonable. Ultimately, both sides obtained some relief. The court enjoined the Former Employees from transmitting any confidential information to third parties, from utilizing any process learned at Sigmapharm that was not in the public domain, from developing certain products, and from influencing or

_____

[18] Specifically, the Former Employees alleged that Spireas breached the fiduciary duty of loyalty owed to them as minority members of the company by diverting funds from Sigmapharm for his personal use, citing purchases of personal vehicles, payments to Spireas's brother in Greece, and payments for personal legal fees. *See* Second Amended New Matter, 6/30/17, at 13-14.

soliciting Sigmapharm employees. However, it held that the five-year non-compete term was unreasonable and limited it to a three-year period covering only products identical to ones they worked on at Sigmapharm. *See* Order, 6/16/15, at 1-2.

The litigation proceeded for years. Of note, Shrestha, Sagi, and Kallur, along with other non-parties, formed the company i3 Pharmaceuticals ("i3") after the expiration of the injunction order. Sigmapharm sued i3 and, during discovery, determined that it had Sigmapharm documents on its servers. Ultimately, that action was discontinued by praecipe. *See* Praecipe to Settle, Discontinue, and End, 8/9/21.

Beginning in October 2021, the parties began filing dispositive motions in accordance with the governing case management order. Sigmapharm and Spireas jointly filed a motion for partial judgment on the pleadings. Therein they contended, *inter alia*, that the Former Employees' claim for breach of oral contract was barred by the statute of limitations and the existence of integrated written agreements governing the terms of their employment. *See* Motion for Partial Judgment on the Pleadings, 10/20/21, at 14-21. Before that motion was decided, Sigmapharm and Spireas moved for summary judgment reiterating those arguments. *See* Motion for Summary Judgment (Sigmapharm and Spireas), 1/18/22, at 12-20. They further sought judgment on the Former Employees' duress defense, asserting that the record was devoid of evidence of to support it, and, even if there were an adequate factual

basis for a finding of duress, the Former Employees ratified the written agreements by performing under them for eight years. *Id*. at 21-28. The Former Employees also moved for summary judgment, seeking judgment as a matter of law on all counts of Sigmapharm's amended complaint. *See generally* Motion for Summary Judgment (Former Employees), 1/18/22. The trial court denied each of the motions.

The parties filed pretrial memoranda and motions *in limine* once the case was listed for trial. Pertinent to this appeal, Sigmapharm and Spireas moved to preclude the admission of parol evidence concerning promises allegedly made regarding the Former Employees' employment and ownership of Sigmapharm in variance of the terms of their integrated written agreements with the company. *See generally* Motion *in Limine* to Preclude Admission of Parol Evidence, 2/27/24. The trial court denied the motion after oral argument.[19] *See* N.T. Trial, 4/8/24, at 4-5.

Trial took place from April 9 to 25, 2024. Sigmapharm's primary witness in presenting its case-in-chief was Spireas who, over four days of testimony, conveyed his version of events to the jury. He indicated that the company never promised to grant a specific amount of equity to any of the Former Employees, orally or in their offer letters; that they did not complain about

_____

[19] Different members of the bench made rulings at various stages of these proceedings over the years.

their equity percentages when the company issued their units in conformance with their offer letters; and that he was blindsided by their sudden threat to leave if he did not meet their demands to gain greater ownership and control over Sigmapharm. *See*, *e.g.*, N.T. Trial, 4/9/24 (Spireas Vol. 1), at 41; N.T. Trial, 4/10/24 (P.M.), at 17-18; N.T. Trial, 4/12/24 (Spireas Vo. 6), at 36-37. Spireas further described how, after Sigmapharm terminated them, he discovered their various dealings with Endo, Mr. O, Azidus, Somnium, Signal Health, and other companies, which he perceived as violations of their confidentiality and non-compete obligations. *See*, *e.g.*, N.T. Trial, 4/10/24 (P.M.), at 66-68. Ultimately, he conceded that he had no evidence that the Former Employees used Sigmapharm's trade secrets or gave them to anyone else, nor any evidence of Sigmapharm confidential information in the hands of another company. *See* N.T. Trial, 4/11/24 (A.M.), at 98-99; N.T. Trial, 4/11/24 (P.M.), at 121-22.

Expert witnesses also offered evidence against the Former Employees. The jury heard from one digital forensics expert concerning the large number of USB devices, including one named "Somnium," that had been attached to Grover's computer; emails to Somnium and other addresses related to Mr. O; files such as "Equipment for Somnium Life Sciences.docx." *See* N.T. Trial, 4/12/24 (P.M.), at 16-54. Another expert detailed his examination of Grover's iPhone and iPad, which showed a high volume of deleted texts and voicemails in September and October 2014, including a message in which Grover

indicated that he was "worried" because someone "who works in [the] computer department in my old company" said that "they found [a] few things on my company computer." *Id*. at 74. A forensic accountant opined that Ogunbiyi had realized $575,000 in profits from Signal Health's dealings on behalf of his brother's Nigerian company, including $282,000 in cash withdrawals. *See* N.T. Trial, 4/18/24, at 147-49.

Sigmapharm called the Former Employees to testify as on cross-examination in its case-in-chief, and the trial court permitted each to also undergo direct examination in support of their claims while on the stand rather than be recalled after Sigmapharm rested. They all recounted the information outlined above about Spireas promising 5% equity or more, starting when they were at Mutual and continuing beyond; disclaimed refusing to work and threatening to leave; and offered the innocent explanations detailed above for their possession of Sigmapharm documents; and denied ever violating their duties of confidentiality, non-solicitation, or non-competition.

Grover offered the most noteworthy testimony, providing a multi-faceted attack on Spireas's character and methods. For example, he expressed feeling guilt about being unable to protect another founding employee of Sigmapharm "from the harsh treatment of . . . Spireas," explaining that the man later died, wheelchair-bound and bankrupt, after he lost three fingers in a workplace accident and Spireas contested his workers' compensation claim. *See* N.T. Trial, 4/16/24, at 98.

Grover also spoke of Spireas's pattern of using litigation or the threat thereof to bully and punish employees, citing former sales and marketing employee Mitchell Goldberg as an example. According to Grover, Spireas arbitrarily decided to terminate Goldberg and, when he asked for a severance package, Spireas sued him, saying "how is he going to fight a lawsuit with me, is he going to sell his house?" *Id*. at 92. Grover told the jury that when Golberg "surrendered" a month later, "Spireas said today we are a Jew free company. Excellent." *Id*.

Grover relayed that Spireas told the Former Employees, at a restaurant shortly after they were terminated, that he similarly was going to "put a team of five lawyers together who will follow you for the rest of your life." *Id*. at 97. Grover further spoke of Spireas harassing former Sigmapharm employees and their families, including having Grover's wife trailed by a detective, paying a state trooper to follow a resigned employee to her new job, having a car waiting outside Grover's new workplace every night at 10:30, and threatening "to throw me and my family on the road and ship us back to India." *Id*. at 99.

Allegations of financial improprieties comprised another line of Grover's attack. He cited Spireas's payments by Sigmapharm to Greek organizations and to Spireas's brother. *Id*. at 120. He noted Spireas admitted to having a "disease with cars," and requested that the company pay for a warehouse to store his twelve vehicles, which included a Bentley and a Rolls Royce. *Id*. at

- 35 -

88, 90. Grover indicated that Bentley and the company that built Spireas's personal home were among Sigmapharm's listed vendors. *Id*. at 118. Between the personal expenses and the "web of loans from the company [that] will never end," the Former Employees were nervous about Spireas's handling of the financials, fearing they "would never make a dollar." *Id*. at 88, 90. Yet, Spireas assured Grover that, although he was "doing a lot of things in the company," he would eventually "clean up everything and give you your share[.]" *Id*. at 88-89.

As its final witnesses, Sigmapharm offered its then-current finance advisor and a business valuation expert to establish its damages. The latter, *inter alia*, opined that the value of the company was $250 million at the end of 2014, and that it sustained $657 million in economic damages as a result of the Former Employees' wrongful acts and omissions. *See* N.T. Trial, 4/18/24, at 157, 224.

Sigmapharm's finance advisor, who came over from Mutual after the Former Employees were fired, supported the benefit to the company of Spireas's loans at 6% interest, indicating that Sigmapharm would not have been able to obtain an unsecured loan from a bank at that rate as a start-up due to the risk. *Id*. at 249-53. He confirmed that the company had not been paying down the principal of the loans, but had paid a total of $8.5 million in interest on them between 2009 and 2013. *Id*. at 255. He informed the jury that, although prior profits "stayed in the company to help pay for the

expenses to run the organization[,] after having lost money for all prior years collectively[,]" Sigmapharm distributed $9,363,884 of profits to members in 2014. *Id*. at 265; N.T. Trial, 4/19/24, at 9. The finance advisor further testified that he found no improprieties in Sigmapharm's financials such as the use of company money for cars, personal expenses, or donations to Greek events. *See* N.T. Trial, 4/19/24, at 5-6. He verified that the book value of Sigmapharm at the end of 2014 was $4,669,704, but that, at the time of trial, the company's revenues were only 60% what they had been in his first year with the company. *Id*. at 40-42; N.T. Trial, 4/18/24, at 262.

For their part, the Former Employees offered two witnesses in addition to their own testimony that had been given during Sigmapharm's presentation of evidence. One was the consultant who worked for both Sigmapharm and i3, who confirmed that no one at i3 asked him for any Sigmapharm documents; rather, he failed to redact the Sigmapharm information from his equipment protocol template documents for i3 in 2017. *See* N.T. Trial 4/19/24, at 48-50. The other was a business valuation expert who opined that Sigmapharm's equity was worth $373,212,016 at the end of 2014.[20] *See* N.T. Trial, 4/22/24, at 134-44.

---

[20] Neither side's valuation expert, nor Sigmapharm's finance advisor, testified to applying the adjusted net book value of the company described in ¶ 11.8 of Sigmapharm's Operating Agreement in arriving at the company's 2014 value.

Sigmapharm and Spireas asked to put two witnesses back on the stand in response to the Former Employees' evidence against them, namely Sigmapharm's business valuation expert and Spireas. The trial court refused to allow either. The court observed that, since the Former Employees' valuation expert did not offer opinions that were outside the scope of his report, the rebuttal matters could and should have been addressed the first time the expert was on the stand. *Id*. at 160-62.

Meanwhile, the request to recall Spireas, raised before Sigmapharm rested its case, was linked to addressing "the real personal, egregious, defamatory attacks that -- especially Grover -- leveled against him[,]" citing Grover's story about Spireas being glad "that they got rid of the Jew." N.T. Trial, 4/18/24, at 277, 283 (title omitted). The court opined that it had sufficiently dealt with that through a cautionary instruction and that counsel for Sigmapharm and Spireas had the opportunity to address the accusations, stating:

> You had plenty of time to question Grover during the time that he followed your client because he wasn't before your client. You knew what the statements were. He was on for a day and a half, or I think something like that. You had plenty of time to prepare whatever you wanted to do. So I am going to be very cautious and you are going to have to tell me why you need to do this because this is like giving you another opportunity to present your case.

*Id*. at 282-83 (title omitted). The court, stating it was disinclined "to really litigate somebody did or did not do that, et cetera, et cetera[,]" since the

case was "not about those kind of remarks[,]" held that the "request for a redirect on that issue is denied."[21] *Id*. at 284.

With the Former Employees having rested and Spireas being precluded from putting on a defense to their counterclaims, the parties moved for directed verdicts. Pertinent to this appeal, Sigmapharm again unsuccessfully sought judgment on the oral contracts counterclaim based on the parol evidence rule. *See* N.T. Trial, 4/24/24, at 8-9. The case then proceeded to closing arguments and the jury charge.

For the most part, the jury instructions had been hashed out by the parties at a special session when court was closed for primary election day. However, in the midst of the charge, both sides proposed additions. The Former Employees asked the court to instruct the jury that it could award the value of their equity interest as a remedy if it found that Sigmapharm breached its contracts. Specifically, the Former Employees requested the following charge: "If a wrongful termination leads to an unjustified surrender or cancellation of employee's equity interest, the employee is entitled to recover damages equal to the value of the equity interest as of the date of

_____

[21] Counsel followed up with an offer of proof of the testimony Spireas would give concerning accusations of wrongdoing, not raised during discovery in the case, identifying topics including the alleged theft of company resources for his personal use. *See* Offer of Proof, 4/22/24, at 2-3. However, it is unclear whether the trial court was made aware of the filing prior to the conclusion of trial.

wrongful termination." *See* N.T. Trial, 4/25/24 (A.M.), at 37. Sigmapharm objected, noting that instruction applied to wrongful termination claims, not one for breach of contract. *Id*. at 30. It argued that the remedy for a breach of contract is to put the non-breaching party in the position it would have been absent the breach, and that "the employment agreement dictates what happens to shares and how shares can be transferred or, rather, not transferred, and in what events they can be reduced to cash value." *Id*. at 20. It maintained that the jury should be told that "the remedy for breach of contract is to put the contracting party back in the position they would have been, which was having units, not liquidating their equity interest and getting X million dollars," as the Former Employees' suggested instruction provided. *Id*. at 30. The court denied Sigmapharm's request and agreed to give the Former Employees' equity-interest-value instruction. It also agreed to give their proposed instruction regarding minority shareholder oppression as a breach of fiduciary duty. *Id*. at 45.

The court then proceeded to charge the jury on the causes of action. Significant to this appeal, regarding the competing contract claims, the court first instructed the jury: "If you find the relationship between the [Former Employees] and Sigmapharm arises from his or her written employment agreement, you must find that the defendants' breach of an oral contract fails." *Id*. at 95. Turning to the Former Employees' claims of breach of written contract, the court stated: "So you have two potential contracts[, t]he oral

contract and the written contract.  You can have both.  You can have neither.

It's up to you to determine, based on the evidence and the law and the facts."

*Id*. at 96.  It then proceeded to state:  "If you find the relationship between

Defendants and Sigmapharm arises from an oral employment agreement, you

must find that the Defendants' breach of the written contract fails."  *Id*. at

96-97.  Regarding the WPCL claim, the court explained that the law "allows

an employee to recover, in addition to wages owed, liquidated damages in the

amount equal to 25[%] of the total amount of wages or $500, whichever is

greater[]," but that "liquidated damages should not be awarded if

Sigmapharm and/or Spireas had a good-faith contest or dispute of any

wage[.]" *Id*. at 109 (title omitted).

The court conferred with all counsel after concluding its charge, at which

time the contradictory nature of the contract instructions, and the fact that

the court neglected to include the late-added remedy instructions, was

brought to its attention.  The court thus brought the jury back "to clear up a

few issues[,]" and charged it as follows:

> You must evaluate both oral and written contracts, both with regard to the individuals, and make a determination if an oral contract exists and/or a written contract exists.  You can have both exist.  And if there's any consequences of that, the court will take care of it by what's called moulding [*sic*] the verdict.
>
> So you will award damages, et cetera, et cetera, but you do not award double damages, but the court takes care of that.  You just answer the questions that are given to you with regard to oral and written damages.  Okay?  So avoid that confusion.  If there's other incidents like that, the court takes care of them by moulding

[*sic*] it. We will make sure there will be no double dipping, as they say. Okay?

Now, there's also a thing that needs to be discussed with you, which is equity interest as a measure of damages, and this is -- in a wrongful termination -- if a wrongful termination leads to unjustified surrender or cancellation of an employee's equity issue interest, the employee is entitled to recover damages equal to the value of the equity interest as of the date of the wrongful termination. Okay?

There is also an issue dealing with minority shareholder's oppression, or called freezing out, an attempt by a majority shareholder to freeze out minority shareholders to continue the enterprise for the benefit of the majority shareholder. And the majority shareholder is Spireas. The minority shareholders are the [Former Employees].

An attempt by majority shareholders to freeze out minority shareholders to continue the enterprise for the benefit of the majority shareholder is a breach of the majority shareholders' fiduciary duty to the minority shareholders. The freeze-out occurs when a majority shareholder uses a strategic position, inside information or power of control or utilization of some legal device or technique to eliminate, from the enterprise, one or more of the owners or participants.

The victim of an unlawful freeze-out typically does not obtain a fair payment for their interest or the enterprise. Shareholder oppression can take many forms, and the tactics employed against the minority shareholder to the effect of such freeze-out include, but are not limited to general oppressive conduct, to withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority shareholders, withholding information related to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholder's appraisal rights, failure to hold meetings and exclude the minority from a meaningful role in the corporation decision-making.

*Id*. at 121-24 (titles and unnecessary capitalization omitted).

The jury retired and completed a thirteen-page verdict slip to render its findings. It determined Sigmapharm failed to prove any of its causes of action, concluding that no Former Employee breached his or her Employment Agreement or fiduciary duty to Sigmapharm, misappropriated any trade secrets, misrepresented or failed to disclose information, or engaged in a civil conspiracy. **See** Verdict, 4/25/24, at 1-4. As for the counter- and third-party claims, the jury found that neither Sigmapharm nor Spireas fraudulently induced any Former Employee to become employed at Sigmapharm, and that none of them had a contract with Spireas, rather than Sigmapharm, governing his or her employment. **Id**. at 8-10, 12.

The jury found in favor of the Former Employees on the remaining counts and stated the damage amounts as formulas. Specifically, it determined that each Former Employee had an oral contract with Sigmapharm that the company breached, and awarded damages as a percentage of a dollar figure close to Sigmapharm's 2014 profits.[22] **Id**. at 5-6. It also concluded

---

[22] We offer the following image of the oral contract damages awards:

| Compensatory: | Rakesh Grover: | 3.5% if 25,470,613 |
| | Lai Ogunbiyi: | 1.75% of 25,470,613 |
| | Ishari Piya Shrestha: | 1.75% of 25,470,613 |
| | Sunil Sagi: | 1.75% of 25,470,613 |
| | Ram Kallur: | 1.75% of 25,470,613 |

Verdict, 4/25/24, at 6.

that Sigmapharm breached written agreements governing the parties'

relationship and issued the following award of damages related that count:

18. What amount of damages, if any, do you award Defendant(s) as a result of Sigmapharm Laboratories' breach of written agreements? If you answered NO for any of the Defendants in Question 17, leave the line below for such Defendants blank.

AND   Compensatory:   Rakesh Grover: _30 days of #375,269.90_

R.G. 3.59% of total
member equity
(4,669,704)

Lai Ogunbiyi: _30 days of #212,100_  annual
2014

Ishari Piya Shrestha: _30 days of #200,000_  salary

L. O, I.P.S, S.S. R.K
1.02%(each) of
total member equity

Sunil Sagi: _30 days of #200,000_

Ram Kallur: _30 days of #200,500_

Ur end of 2014

*Id*. at 7.

Next, the jury found that Spireas breached fiduciary duties owed to each

Former Employee causing no compensatory damages. *Id*. at 7-8. However,

it awarded punitive damages in what appears to be the 2014 value of

Sigmapharm multiplied by the percentage of equity each held in the company

before termination.[23] *Id*. at 8. Finally, the jury decided that the Former

_____

[23] Specifically, the jury stated the following punitive damages awards:

*(Footnote Continued Next Page)*

Employees were entitled to an award of 25% of thirty days' worth of their 2014 salaries under the WPCL claims, but also found that Sigmapharm had a good faith basis to dispute the wage claims. *Id*. at 10-11.

The parties all filed timely post-trial motions. The Former Employees moved for dissolution of the preliminary injunction and to mold the verdict by performing the mathematical calculations necessary to arrive at sum certain for each award. Sigmapharm and Spireas each sought, in the alternative, judgment notwithstanding the verdict ("JNOV") or a new trial, raising a host of errors including those they pursue on appeal. Of note, Sigmapharm again argued that the parol evidence rule and statute of limitations precluded the Former Employees from prevailing on their oral contract claims, and sought JNOV on their written contract and WPCL counts. Spireas maintained that they had no viable fiduciary duty claim against him and that the punitive damages award was not supported by the evidence. Both Sigmapharm and

---

| Rakesh Grover: | 3.5% of $ 310,000.000 |
| Lai Ogunbiyi: | 1.02% of $ 310,000,000 |
| Ishari Piya Shrestha: | 1.02% of $ 310,000,000 |
| Sunil Sagi: | 1.02% of $ 310,000,000 |
| Ram Kallur: | 1.02% of $ 310,000,000 |

Verdict, 4/25/24, at 8. It is not entirely clear what the dollar figure represents, but we observe that $310 million is halfway between the rounded-off 2014 valuations of Sigmapharm offered by Cowhey ($250 million) and O'Neill ($370 million).

Spireas asserted that a new trial was warranted because the court improperly forbade Spireas from retaking the stand to testify in defense of the counterclaims.

The trial court issued rules to show cause, granted extensions of time to respond, and entertained oral arguments on August 22, 2024. Although the trial court promptly entered an order molding the verdict, it never issued orders resolving all the motions. In the face of no rulings after more than 180 days, on November 4, 2014, the Former Employees elected to *praecipe* for entry of judgment on the verdicts pursuant to Pa.R.Civ.P. 227.4(1)(b) (allowing entry of judgment upon *praecipe* of a party when the trial court fails to dispose of timely post-trial motions within 120 days).[24, 25] These timely appeals followed.

The trial court ordered Sigmapharm and Spireas to file Pa.R.A.P. 1925(b) statements, and both timely complied.[26] The trial court issued

_____

[24] Grover's judgments were for more than $1 million and nearly $11 million, while the other Former Employees' respective judgments were for over $500,000 against Sigmapharm and $3 million against Spireas.

[25] The trial court indicated that the motions "were denied as a matter of law on August 30, 2024," citing Rule 227.4(1)(b) and asserting it states: "If the court's decision is not rendered within 120 days, the motion shall be deemed denied." Trial Court Opinion (Sigmapharm's appeal), 12/5/24, at 31, n.124. However, the quoted sentence does not appear within the Rule.

[26] We remind the trial court that it is not sufficient to direct an appellant to submit a copy of the statement to the judge's chambers because the court
*(Footnote Continued Next Page)*

separate Rule 1925(a) opinions addressing the claims of error raised by each

appellant.[27]  This Court entertained argument from the various parties in both

appeals and shall now proceed to separately address the issues raised in each.

## II.   Sigmapharm's appeal

Sigmapharm presents the following issues, which we have re-ordered

for ease of disposition:

1. . . .

   a.   Could the trial court admit parol evidence without finding an ambiguity?

   b.   Could the trial court have the jury consider oral terms that directly contradicted unambiguous terms of multiple later written integrated agreements?

   c.   Was an alleged "oral contract" by a company before it was formed and before it and the Former Employees executed and operated pursuant to written agreements for more than seven years timely?

---

must include "both the place the appellant can serve the Statement in person and the **address** to which the appellant can mail the Statement."  Pa.R.A.P. 1925(b)(3)(iii) (emphasis added).

[27] While a jurist understandably will advocate in its Rule 1925(a) opinion for the propriety of the court's rulings, the court's writings in these appeals are rife with a palpable disdain for Spireas that was less overtly suggested in the notes of testimony from the trial.  Indeed, Spireas and Sigmapharm raised the court's impatience with Spireas and his counsel, and its disparate treatment of the Former Employees during their testimony, among the bases for a new trial.  ***See***, ***e.g.***, Memorandum in Support of Spireas's Amended Post-Trial Motion, 6/27/24, at 31-34.  Since the trial court never addressed the motions, and Sigmapharm and Spireas do not pursue those claims on appeal, we have no response from the court to these claims.  In any event, the court should be mindful of its duty to maintain both actual impartiality and the appearance thereof should it preside over the post-remand retrial.

2.      When the jury is told that the law precludes both an oral and a written contract, but then to find both and let the court take care of it, and the trial court agrees, should that part of the verdict be set aside?

3.      Could Former Employees' counterclaim for breach of the written contracts succeed given their admitted breaches?

4.      Did the court properly instruct the jury to find equity damages for wrongful termination?

5.      When the jury finds that an employer has a good faith dispute and a jury awards only liquidated damages under a [WPCL] claim and the trial court agrees that part of the verdict should be set aside—should it be set aside?

Sigmapharm's brief at 9-11 (cleaned up).

Since the bulk of Sigmapharm's issues implicate contract interpretation and enforcement, we begin our analysis with an examination of the fundamental governing principles. To succeed on a claim for breach of contract, a party must establish "the existence of a contract, a breach of duty imposed by the contract, and damages." ***Kalili v. State Farm Fire & Cas. Co.***, 330 A.3d 396, 403 (Pa.Super. 2024). A contract exists where there the parties: "(1) reach a mutual understanding, (2) exchange consideration, and (3) delineate the terms of their bargain with sufficient clarity." ***Myers Water Transfer, LLC v. LOLA Energy PetroCo, LLC***, 351 A.3d 256, 264 (Pa.Super. 2025) (cleaned up, opening parentheses added). "[A] contract may be manifest orally, in writing, or as an inference from the acts and conduct of the

parties." ***Sullivan v. Chartwell Inv. Partners, LP***, 873 A.2d 710, 716 (Pa.Super. 2005).

While it is for the trier of fact to "evaluate whether the evidence establishes facts that could meet the requisite elements of a contract[,] . . . once those facts are found, it becomes a question of law whether they satisfy the requisite legal elements." ***Glover v. Junior***, 333 A.3d 323, 339 n.12 (Pa. 2025). In finding facts, it is the jury that is tasked with assessing, then accepting or rejecting, the evidence before it, being "free to believe, all, some or none of the testimony presented by a witness." ***Hyang v. Lynde***, 820 A.2d 753, 756 (Pa.Super. 2003) (cleaned up). However, interpretation of contracts is a question of law subject to *de novo*, plenary review by this Court.[28] ***See Vinculum, Inc. v. Goli Techs., LLC***, 310 A.3d 231, 242 (Pa. 2024) (providing contract interpretation standard of review).

Stated plainly, "[t]he whole point of contract law is to effectuate the intent of the parties." ***Glover***, 333 A.3d at 355. It is a well-settled principle of Pennsylvania law that, "[w]here the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement."

---

[28] This likewise applies to the interpretation of LLC operating agreements. ***Toth v. Toth***, 324 A.3d 469, 486 (Pa.Super. 2024) (indicating an LLC operating agreement is a contract between members).

**Gasbarre Products, Inc. v. Smith**, 270 A.3d 1209, 1220 (Pa.Super. 2022) (cleaned up).

Where the parties have an enforceable agreement and "performance of a duty under a contract is due, any nonperformance is a breach." **Seneca Res. Corp. v. S & T Bank**, 122 A.3d 374, 379 (Pa.Super. 2015) (cleaned up). If a party commits an unjustified breach of contract, "the other party is entitled to recover, unless the contract provided otherwise, whatever damages he or she suffered[.]" **Davis v. Borough of Montrose**, 194 A.3d 597, 611 (Pa.Super. 2018) (cleaned up). "A damage award should place the non-breaching party as nearly as possible in the same position [he or she] would have occupied had there been no breach." **Id**. at 612 (cleaned up).

With these principles in mind, we turn to Sigmapharm's appellate issues. In the first cluster of questions, it assails the propriety of the verdict against it for breach of oral contract. For one, Sigmapharm argues that it is entitled to JNOV on the oral contract claim because the parol evidence rule barred proof of any oral contracts concerning the terms of the Former Employees' employment. **See** Sigmapharm's brief at 59-62. Utilizing a different approach to the same end, Sigmapharm alternatively claims that it is entitled to have the verdict molded in accordance with the trial court's jury instructions that a finding the parties' relationship was governed by a written contract was fatal to the Former Employees' oral contract claims, but the jury could nonetheless find both written and oral agreements and the court would mold the verdict.

*Id*. at 52-53. Sigmapharm further contends that the statute of limitations bars the oral contract claims since they were pled a decade after Spireas made his promises regarding the Former Employees' equity. *Id*. at 63-64.

Since we find it dispositive, we begin with Sigmapharm's contention that it is entitled to JNOV based on the parol evidence rule, mindful of the following:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference.
>
> Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [fact-finder] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Coryell v. Morris*, 330 A.3d 1270, 1277–78 (Pa.Super. 2025) (cleaned up).

Here, the trial court opined that proof of the oral agreements between Sigmapharm and the Former Employees was not parol evidence because they "were not seeking to introduce evidence about the oral contracts for the purpose of bolstering the written contracts[,]" but instead to prove a claim they properly pled in the alternative. *See* Trial Court Opinion, 1/3/25, at 38-39. The court explained:

- 51 -

> [T]he parol evidence rule is inapplicable where the oral agreement concerns a subject which was not specifically dealt with in the written agreement. This is because the parol evidence rule only applies when the alleged prior or contemporaneous oral representations or agreements concern a subject which was specifically dealt with in the written contract, and the written contract covers or purports to cover the entire agreement of the parties.
>
> Here, the Employment Agreements only state that they are the "entire agreement" with respect to themselves, do not state that they "supersede" or "integrate" any and all prior agreements, do not state that such prior agreements are merged, and do not even specifically acknowledge or address any prior agreements. Therefore, there is no clear, unambiguous integration clause and the Employment Agreements do not supersede the oral agreements.
>
> In addition, the types of shares promised in the oral agreements are different from the types of shares promised in the written agreements. In other words, the agreements govern different subject matters. After all, the equity interests are different in amount, in time to vest, in series, and voting shares.

*Id*. at 42-43 (cleaned up). The court went on to posit that even if the Former Employees' testimony about oral agreements concerning the amount of equity to which they would receive was parol evidence, it was admissible to establish that the written Employment Agreements were signed under duress. *Id*. at 39-41.

As noted above, the parol evidence rule provides that, where the parties elect to reduce their entire agreement to writing, "the law declares the writing to be not only the best, but the only, evidence of their agreement." ***Gasbarre Products***, 270 A.3d at 1220 (cleaned up). Our Supreme Court has explained as follows regarding the assessment of the rule's applicability:

- 52 -

> To determine whether or not a writing is the parties' entire contract, the writing must be looked at and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement, it is conclusively presumed that the writing represents the whole engagement of the parties. An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (cleaned up). "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." *Id*. at 436-37. Nonetheless, when one writing "refers to and incorporates the provisions of another, both shall be construed together." *Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 560 (Pa. Super. 2006).

In other words, the parol evidence rule operates to prevent a party from avoiding the effect of an integrated written contract by contending that, contrary to what he or she signed, there were other agreements that are not stated in the document. As our Supreme Court long ago questioned: "What is the use of inserting such clauses in agreements if one of the parties thereto is permitted to prove by oral testimony [statements contrary to the writing]?" *Bardwell v. Willis Co.*, 100 A.2d 102, 104 (Pa. 1953).

However, there are exceptions to the parol evidence rule. When the terms of a written agreement are ambiguous, "parol evidence is admissible to explain or clarify or resolve the ambiguity[.]" *Yocca*, 854 A.2d at 437 (cleaned up). It is also the case that "parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake."[29] *Id*. Finally, duress can be a basis to invalidate even an integrated written contract, and parol evidence is admissible to demonstrate that an agreement was executed under duress. *See*, *e.g.*, *Sabad v. Fessenden*, 825 A.2d 682, 688 (Pa.Super. 2003); *Iron Worker's Sav. & Loan Ass'n v. IWS, Inc.*, 622 A.2d 367, 374 (Pa.Super. 1993).

We have no hesitation in concluding that, as a matter of contract interpretation, the Employment Agreements, along with the expressly-incorporated Operating Agreement, constitute the entire contract between Sigmapharm and each Former Employee.[30] As we detailed above in our

---

[29] Our High Court has made it clear that the type of fraud allegation that allows for the introduction of parol evidence is fraud in the execution, *i.e.*, to prove that an agreed-upon term was fraudulently omitted from the contract, but not to establish fraud in the inducement, namely that the signatory to the contract was induced by false representations to agree to it. *See Yocca*, 854 A.2d at 437 n.26.

[30] The Former Employees make little effort to persuade us otherwise, offering a two-sentence argument to the contrary based only upon a non-binding federal district court case involving not oral agreements and the parol

*(Footnote Continued Next Page)*

factual recitation, each Employment Agreement contained provisions detailing the scope of services to be provided and the employee's compensation therefor, including equity compensation, along with the at-will term of the contract and the means and effects of its termination depending upon who terminates it and the reason for it. **See** *supra* at pages 9-12. The Operating Agreement offered thirty-six pages of additional detail about the various equity stakes in Sigmapharm, including limitations on their transfer and the cap on Series B units at no more than 10% of all outstanding units. **See** Operating Agreement at ¶ 4.3(a) ("[N]o Series B unit may be issued if such issuance would cause the aggregate number of outstanding Series B units immediately after such issuance to exceed ten percent of the aggregate number of outstanding units of the company immediately after such issuance." (cleaned up)). **See also id**. at ¶¶ 4.1-4.4 (membership), 8.1-8.2 (distributions), 11.1-11.14 (restrictions on transfer, removal of members, dissociation, redemption of member interests).

If that were not enough indication that the documents constituted "a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the

---

evidence rule, but multiple non-integrated written agreements. **See** Former Employees' brief at 53 (citing **Synthes, Inc. v. Emerge Med., Inc.**, 25 F. Supp. 3d 617, 697-98 (E.D. Pa. 2014)).

parties' engagement," *Yocca*, 854 A.2d at 436 (cleaned up), the writings both contained an integration clause stating that it was the whole contract.

Specifically, each Former Employee's Employment Agreement stated: "This Agreement contains the entire Agreement of the parties and no amendments or modifications shall be valid, unless in writing and executed by all parties." *See*, *e.g.*, Exhibit P-4 (Ogunbiyi Employment Agreement) at § 11(c). Their subsequent joinders in the Operating Agreement manifested their further understanding that no past or future oral agreement could vary the terms of the writings:

> This agreement, and the schedules hereto, constitutes the entire agreement between the company and the members with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, representations and understandings of the parties. Provided, however, that in the case of any conflict between this Agreement and the terms of the employment agreement between the company and an employee member (if any), the terms of such employment agreement shall prevail. **No party hereto shall be liable or bound to the other in any manner by any warranties, representations, or covenants with respect to the subject matter hereof except as specifically set forth herein**.

Operating Agreement at ¶ 13.1 (cleaned up, emphasis added).

As such, the Former Employees' testimony that Spireas had orally promised, before and after they executed the written agreements, to give them each specific percentages of equity in Sigmapharm that would amount to 30% employee ownership of the company was inadmissible to vary the

terms of the written agreements unless an exception to the parol evidence rule applied.

In that vein, the Former Employees assert that parol evidence was admissible to establish "that the Employment Agreements are void due to duress." Former Employees' brief at 55. They argue:

> Sigmapharm offered the one-sided Employment Agreements to the Former Employees and they were not freely negotiated. The Former Employees were faced with signing the one-sided agreement or else losing their jobs on a summary termination basis, having already given up their prior positions at Mutual months before based on the Oral Agreements. The Former Employees had significant concerns, including family and financial obligations, which they believed left them no alternative but to capitulate to Sigmapharm's demands. The circumstances under which the Employment Agreements were agreed to by the Former Employees demonstrate that they lacked a meaningful choice. Because the Former Employees alleged that they entered into the Employment Agreements under duress, the parol evidence rule does not apply.

*Id*. at 54 (cleaned up).

Sigmapharm counters that, although the Former Employees pled the affirmative defense of duress, they did not present the issue to the jury as "there was no jury instruction on duress and no special interrogatory asking the jury to find duress" as a cause to invalidate the written contracts. *See* Sigmapharm's brief at 59. Rather than deeming the Employment Agreements void due to duress, the jury found them enforceable and awarded damages to the Former Employees for breach of those written contracts. *Id*. at 60. The Former Employees concede "that a formal duress instruction was not given,"

but suggest "it appears to have been an inadvertent omission that has no bearing on the issue of admissibility." Former Employees' brief at 54 n.6.

Duress is defined as "that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness." *Radon Constr., LLC v. Land Endeavor 0-2, Inc.*, 221 A.3d 654, 659 (Pa.Super. 2019) (cleaned up). Economic duress has two elements: "(1) there exists such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which results in economic loss, and (2) the injured party does not have an immediate legal remedy." *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 115 (Pa.Super. 2015) (cleaned up). This form of duress "is not established merely by proof that consent was secured by the pressure of financial circumstances, but a threat of serious financial loss may be sufficient to constitute duress and to be ground for relief where an ordinary suit at law or equity might not be an adequate remedy." *Id*. (cleaned up).

This Court has long held that "economic duress merely renders a contract voidable, not void." *Radon Constr.*, 221 A.3d at 661. Further, "if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract,"

then the party is deemed to have ratified the contract. *Id*. at 661–62 (cleaned up).

Even if we assume *arguendo* that duress had been properly presented to the jury at trial, that the jury accepted as true the Former Employees' testimony that they felt they had no choice but to sign at the time, and that their laments were legally sufficient to constitute economic duress, Sigmapharm would nonetheless still be entitled to JNOV on the oral contract claims. First, the jury did not conclude that the written agreements were void. Instead, it specifically found that the relationships between the Former Employees and Sigmapharm were governed by the written agreements and enforced those agreements by awarding the Former Employees damages for the breach thereof. *See* Verdict, 4/25/24, at 6-8. Consequently, the Former Employees' alternatively-pled claims for breach of an oral contract containing different conditions of employment were extinguished as a matter of law.

Furthermore, JNOV on the oral contract claims is still apt even if we deem the finding that Sigmapharm breached both written and oral contracts to be a reflection of the jury's belief that duress negated the written agreements in part.[31] Viewing the evidence in the light most favorable to the

---

[31] As recounted *supra* on pages 40-42, the trial court gave the jury confusing and conflicting instructions, telling it: (1) the oral contract claims failed if it found a written agreement governed the relationship; (2) the written contract claims failed if it found the relationship governed by oral contracts; and (3)
*(Footnote Continued Next Page)*

Former Employees, it is nonetheless plain as a matter of law that they ratified the written agreements.[32]

The parties all performed under the written agreements from when they were signed in October 2006 and June 2007 until Sigmapharm terminated their employment in September 2014. Sigmapharm offered, and the Former Employees accepted, various tranches of Series B units in accordance with the writings. **See** N.T. Trial, 4/18/24, at 76-79; Exhibit P-332a. Between 2006 and 2014, the Former Employees received and retained six-figure annual salaries, bonuses ranging from $10,000 to $100,000, and distributions of net operating cash flow, amounting to $8.2 million in total compensation. **See** N.T. Trial, 4/18/24, at 92. Rather than seeking to rescind or disaffirm the written contracts at any point over the years of their employment, they engaged Attorney Peck to negotiate modifications to portions of them. It was not until Sigmapharm sued them to enforce the Employment Agreements that the Former Employees first sought to nullify the written agreements due to duress.

---

the jury could go ahead and find that the relationship was governed by both types of contracts and the court would "take care of it."

[32] While it is for the jury to resolve the underlying factual questions concerning the circumstances of the parties, whether those facts sufficiently "constitute duress as a matter of law is a purely legal question for which our scope of review is plenary, and our standard of review is *de novo*." **Lewis v. Lewis**, 234 A.3d 706, 715 (Pa.Super. 2020).

The extensive passage of time and acceptance of benefits flowing from the agreements amount to ratification such that duress was no longer a basis for them to avoid the written agreements. *Accord Radon Constr.*, 221 A.3d at 662 (holding defendant was entitled to judgment as a matter of law because, even if plaintiff signed their contract under economic duress, it ratified it by remaining silent and continuing the project for six months, only raising duress after the defendant gave notice of termination); *Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp.*, 364 A.2d 470, 476 (Pa.Super. 1976) (reversing trial court decree enforcing earlier agreement upon finding that subsequent contract was the product of economic duress because, even if the later agreement was entered under duress, the party seeking to avoid it ratified it by operating pursuant to it for two and one-half months, profited from it, initially "sought not to disaffirm or rescind the contract but rather to obtain a modification of it," and only claimed economic coercion when those negotiations failed).

In sum, the Former Employees' relationship with Sigmapharm, including the terms and conditions of their ownership interests in the company, was governed by integrated written contracts. Consequently, their claims for breach of oral contract seeking to recover for Sigmapharm's oral promises to grant them consideration different than what the written contracts provided were untenable as a matter of law. The oral contract claims pled by the Former Employees were not viable as a theory of recovery at trial because

their choices to perform under the written agreements and reap the benefits therefrom, for nearly ten years beyond the time they felt compelled to sign them due to then-existing economic compulsion, resulted in ratification of the written contracts and the loss of any right they had to void them due to duress. Therefore, the parol evidence rule served to bar the Former Employees from offering evidence of the existence of oral agreements contrary to the terms of the written agreements. As such, Sigmapharm is entitled to JNOV on the Former Employees' claims for breach of oral contract.[33]

Sigmapharm next challenges the trial court's failure to grant it JNOV on the Former Employees' claim for breach of written contract. It maintains that the Former Employees admittedly breached the contractual obligations of their Employment Agreements in "that they engaged in competing ventures (*e.g.*, Somnium, [another Mr. O company], Signal Health, etc.), withheld material information, and misused Sigmapharm's [c]onfidential [i]nformation[.]" Sigmapharm's reply brief at 8. It suggests that this was conclusively established by the Former Employees' failure to appeal the grant of the preliminary injunction enforcing the Employment Agreements. **See** Sigmapharm's brief at 46-47. Since "a breaching party may not insist upon performance of the contract by the non-breaching party[,]" Sigmapharm

---

[33] Our ruling moots Sigmapharm's alternative argument that the oral contract claims were barred by the statute of limitations.

argues that their written contract claims were extinguished and should not have gone to the jury. [34] *Id*. at 48 (quoting ***Nowicki v. Crown Fin. Corp.***, 284 A.3d 957, 2022 WL 3908904, at *1 (Pa.Super. 2022) (non-precedential decision)).

The Former Employees are emphatic that they did not admit to breaching any contractual obligations. ***See*** Former Employees' brief at 27-28. They observe that Sigmapharm offered no legal authority for the proposition that failing to appeal a preliminary injunction order amounts to an admission of liability. *Id*. at 28. They argue that preliminary injunctions merely preserve the status quo, not determine liability. *Id*. at 28 n.4 (citing ***Ambrogi v. Reber***, 932 A.2d 969, 978 (Pa. Super. 2007)). The Former

_____

[34] Sigmapharm presented this issue in its Rule 1925(b) statement as follows:

> The trial testimony of the Former Employees admitted their breaches of their contracts, their breaches of fiduciary duty and fraudulent concealment; accordingly, the [c]ourt erred in not awarding Sigmapharm judgment as a matter of law on those claims, and erred in not recognizing that, as a result, the Former Employees could not, as a matter of law, establish substantial performance, an essential element of their claims.

Sigmapharm's Concise Statement, 12/5/24, at 3. The trial court, which misquoted this claim of error in its opinion, asserted that Sigmapharm waived this issue by presenting it in a manner so vague that it had to guess what Sigmapharm was challenging, but properly addressed it in the event that this Court disagreed. ***See*** Trial Court Opinion (Sigmapharm's appeal), 1/3/25, at 46-50. Assuming Rule 1925(b) waiver is implicated in this appeal despite the deficiencies in the court's order, the issue was plainly stated with sufficient specificity that the court could, and did, ascertain the point of error alleged by Sigmapharm. Therefore, we decline to find waiver.

Employees posit that "Sigmapharm's 'admitted breach' theory is nothing but a baseless attempt to have this Court improperly engage in a *de novo* reweighing of evidence . . . and thereby invade the province of the jury and disturb its well-supported findings, which rejected Sigmapharm's claims of breach by the Former Employees." *Id*. at 28.

We agree with the Former Employees. The preliminary injunction only confirmed that the Former Employees were required to abide by the implicated provisions of their Employment Agreements while the litigation proceeded, albeit for a shorter duration given the finding that five years was unreasonable. Sigmapharm's evidence did not necessarily establish that they had committed any breaches prior to the injunction order, as "the party seeking an injunction is not required to prove that he will prevail on his theory of liability, but only that there are substantial legal questions that the trial court must resolve to determine the rights of the parties." *Ambrogi*, 932 A.2d at 976.

The jury heard both sides' evidence and rejected Sigmapharm's claim that the Former Employees had violated their contractual obligations. It was free to believe their testimony, detailed above, that they had not refused to perform their work; that their possession of Sigmapharm documents in their homes or on their personal devices was with Sigmapharm's knowledge and tacit approval; that they never shared or misused Sigmapharm's confidential information; and that their involvement with companies such as Somnium,

Endo, and Signal Health was either in furtherance of Sigmapharm's interests or at least not in competition with them. *See supra* at pages 17-21 and 26 n.16. Moreover, the Former Employees' testimony was corroborated by Spireas's acknowledgement that, in ten years of litigation, Sigmapharm had not uncovered any evidence of another company having or using Sigmapharm's confidential information. *See* N.T. Trial, 4/11/24 (A.M.), at 98-99; N.T. Trial, 4/11/24 (P.M.), at 121-22.

Hence, our review of the record has revealed that the evidence was not such that reasonable minds must necessarily conclude that the Former Employees breached their contractual obligations. Nor was Sigmapharm otherwise entitled to judgment as a matter of law. ***Compare LJL Transp., Inc. v. Pilot Air Freight Corp.***, 962 A.2d 639, 652 (Pa. 2009) (holding non-breaching franchisor was entitled to judgment as a matter of law on breach of contract claim because it was not bound by notice-and-cure provision of franchise agreement where the franchisee admitted to violating the contract by systematically diverting business to another company owned by the franchisee); ***with Hunter v. Glenn O. Hawbaker, Inc.***, ___ A.3d ___, 2026 WL 222031, at *16 (Pa.Super. 2026) (non-precedential decision) (holding summary judgment on breach of contract claim was inappropriate where disputes of fact regarding whether the defendant "acted in good faith in performing its contractual obligations" remained to be resolved by the fact-

finder). Thus, Sigmapharm was not entitled to JNOV on the Former Employees' claims for breach of their Employment Agreements.

In its next claim of error, Sigmapharm argues that the trial court gave an improper instruction on the damages available to the Former Employees for Sigmapharm's breach of the Employment Agreements. Before we consider the merits of the issue, we must address the assertions of the trial court and the Former Employees that Sigmapharm waived this claim of error by failing to state it with sufficient specificity in its Rule 1925(b) statement.

Therein, Sigmapharm presented the issue thusly: "The damages instruction was an incorrect statement of Pennsylvania law and led to an incoherent and unsupportable award of contract damages under Pennsylvania law." Concise Statement (Sigmapharm), 12/6/24, at 4. The trial court addressed it as follows in its Rule 1925(a) opinion:

> [O]ut of the counts that went to the jury, there were six counts requesting solely compensatory damages, and six counts requesting both compensatory and punitive damages. In other words, this court gave around eighteen instructions regarding damages to the jury. Therefore, this court has no idea which of the eighteen damage instructions given to the jury was allegedly an "incorrect statement of Pennsylvania law." Thus, this court believes that this issue is waived.
>
> To the extent that this issue is meritorious, this court would like to note that, regarding damages, it charged the jury using the Pennsylvania Standard Jury Instructions — suggested by both parties in this case — and read those charges largely verbatim. This court is, therefore, astounded that Sigmapharm is suggesting the Pennsylvania Standard Jury Instructions are an incorrect statement of Pennsylvania law. Thus, this court believes this issue is without merit.

Trial Court Opinion, 1/3/25, at 65-66 (cleaned up).

We are unpersuaded that the court was left to speculate with which instruction Sigmapharm took issue. The stated error referred to an instruction that led to the award of **contract** damages, which narrows it to two of the twelve counts. More significantly, Sigmapharm's post-trial motion, in alleging that "the jury was improperly instructed on damages," assailed one specific damages instruction and fleshed out the issue in great detail by quoting the instruction it was challenging, indicating where it preserved its objection, identifying the instruction it proffered in its stead, and describing how the jury's verdict was unsupportable under the correct law. *See* Motion for Post-Trial Relief (Sigmapharm), 5/6/24, at 45-48. Thus, the court was readily able to ascertain which instruction Sigmapharm was going to challenge on appeal such that, assuming that Rule 1925(b)'s waiver provision is enforceable in this appeal despite the court's defective Rule 1925(b) order, it does not apply here.

Therefore, we consider the merits of the claim, mindful of the governing law:

> On review of a challenge to a jury instruction, an appellate court must determine whether the trial court abused its discretion or offered an inaccurate statement of law controlling the outcome of the case. Relief may be proper if the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. A new trial must be granted if an erroneous jury instruction amounted to a fundamental error or the record is insufficient to determine whether the error affected the verdict.

***Lewis v. Reading Hosp.***, 345 A.3d 257, 276 (Pa.Super. 2025) (cleaned up).

Here, the trial court initially provided a charge incorporating the standard suggested jury instruction concerning damages available for Sigmapharm's breach of the Employment Agreements, stating:

> If you find that a party breached the written employment agreement, you should award an amount of money that will be -- fairly and adequately compensated the non-breaching party. In this case, we're now talking about the individuals as to non-breaching party, for the harm caused by the breach.
>
> The amount you award today must compensate the individual party completely for damages sustained in the past, as well as the amount of damages it will sustain in the future. And you heard what the plaintiff is claiming that is with regard to each one individually about certain aspects of this case.
>
> The parties claim the following type of damages: Consequential damages. Damages include the amount of money that will be -- put the non-breaching party -- that means -- in this case, we're talking about a written contract on the counterclaim -- in the position it would have been in if the breaching party had not breached the contract.
>
> In this case, again, the breaching party is the pharmacy [*sic*] if you find the non-breaching party are the individuals.
>
> Generally -- I'm sorry. It includes not only damages that directly results from the breach, but also those that were foreseeable at the time the parties entered into the contract. You've heard testimony as to the claims of each party with regard to that. It is for you to determine.

N.T. Trial, 4/25/24 (A.M.), at 99-100.

The court then proceeded to charge the jury as to the remaining causes of action. After a break at which counsel for the parties raised various issues in need of correction or clarification, the court brought the jury back and

issued, over Sigmapharm's objection, the instruction requested by the Former Employees regarding charging as follows: "If a wrongful termination leads to an unjustified surrender or cancellation of employee's equity interest, the employee is entitled to recover damages equal to the value of the equity interest as of the date of wrongful termination." *Id*. at 37.

It is this equity-interest-as-a-measure-of-damages instruction that Sigmapharm challenges on appeal. Despite the trial court's representation to the contrary, it was not one that was suggested by both parties. Indeed, it was not discussed at all during the day-long charging conference held on April 23, 2025, but was presented to the court by the Former Employees on April 25, 2025, in the midst of the jury charge. Nor is it among the Pennsylvania Standard Suggested Jury Instructions. Rather, the legal basis for the instruction was a decision from the Third Circuit Court of Appeals in *Scully v. US WATS, Inc.*, 238 F.3d 497 (3d Cir. 2001).

The Former Employees advocate for the propriety of the *Scully* instruction as follows:

> The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach. The rule is the same when the breach of contract is non-delivery of stock shares. Thus, if a wrongful termination leads to an unjustified surrender or cancellation of an employee's equity interest, the employee is entitled to recover damages equal to the market value of the equity interest as of the date of the wrongful termination. *See Scully*[, 238 F.3d at 510] ("In this case, the District Court adhered to the general breach of contract rule by calculating damages as of the date of breach. The Court's decision is consistent with the view that a failure to deliver

- 69 -

securities or stock options, pursuant to a legally binding agreement, constitutes a breach of contract.").

Sigmapharm presents no credible argument to support its belief that the measure of damages articulated by the **Scully** Court should not apply. While Sigmapharm engages in a lengthy dissertation as to how the shares of stock in Sigmapharm are restricted per the terms of the [Operating] Agreement, it is undisputed that there is no provision in the [Operating] Agreement relevant to calculating the value of equity interests wrongfully taken from their owner.

Former Employees' brief at 58-59.

Moreover, the Former Employees contend that any error in the instruction was harmless since the jury did not award contract damages based upon the market value of their equity at the date of termination. Instead, they assert that the award for breach of the written contracts was "[thirty] days of 2014 salary and a percentage share of Sigmapharm's total member equity for 2014 as set forth on Sigmapharm's 2014 financial statement." **Id**. at 59.

For its part, Sigmapharm maintains that, in instances of a right to recover for a breach of contract, "one looks at the contracts to determine whether any contractually-specified process was followed and what the consequences were." Sigmapharm's brief at 55. Here, Sigmapharm explains, the contracts provided that termination for cause resulted in the surrender of Former Employees' Series B units, while at-will termination would be a conversion event by which "Ogunbiyi would get only D units, and the others would hold their B units, but under either scenario, there was no right for them

to" receive the cash value of their units by transferring them or "insist[ing] that the company be sold." **Id**. Instead, it argues, "the jury had nothing but the faulty instruction to limit its damages," and therefore, in addition to awarding the Former Employees the thirty-days' pay to which they were entitled under the Operating Agreement, "it also awarded a percentage of equity, an award that was fundamentally inconsistent with the contract terms the Former Employees claimed they were enforcing." **Id**. at 56.

We agree that Sigmapharm is entitled to relief. The purpose of an award for breach of contract is to "place the non-breaching party as nearly as possible in the same position [he or she] would have occupied had there been no breach." **Davis**, 194 A.3d at 612 (cleaned up). Where, as here, the non-breaching party does not seek reimbursement for losses caused by reliance on the contract or restitution of the benefit he conferred on the breaching party, damages are awarded to satisfy "his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." **Mirizio v. Joseph**, 4 A.3d 1073, 1088 (Pa.Super. 2010) (quoting Restatement (Second) of Contracts § 344(a)).

Expectation interests are, therefore, necessarily tied to the particular contract at issue, as it is the terms of the contract itself that reflect what the parties expected to receive. For this reason, putting aside that **Scully** is a non-binding federal decision that does not cite to or purport to apply

Pennsylvania law on the damages issue, its factual dissimilarities render it devoid of even persuasive authority. *Scully* involved the right of Mr. Scully, a publicly-traded corporation's president and COO, to recover the value of lost stock options. Mr. Scully's employment contract was not at-will, but for a term of two years, set to end in May 1997. The company fired him at the end of December 1996 and refused to allow him to exercise his option to purchase restricted shares in January 1997, maintaining that they had expired when his employment ceased.

The *Scully* Court approved the trial court's ruling that the company's premature and wrongful termination of Mr. Scully's two-year contract prevented the company from rejecting Mr. Scully's post-termination attempt to exercise the options. It also affirmed the court's decision to award Mr. Scully the difference between the exercise price of the option and the market price of unrestricted shares on the date of the company's breach of the contract because it placed Mr. Scully "in a position most closely reflecting the one he would have occupied absent [the company's] breach." *Scully*, 238 F.3d at 515. Specifically, Mr. Scully was awarded the sum of money he would have needed to obtain "the same number of shares on the open market, the only remaining source for the shares." *Id*. at 513.

Stated differently, as an executive employee, Mr. Scully had a right to purchase stock at an agreed fixed price when he attempted to do so in January 1997. Thus, he would have held those shares of the company as of that date

but for the company's breach of his employment contract. Awarding him the money he would have needed to instead purchase those shares on the stock market satisfied his expectation interests by giving him what he would have had, and continued to hold after his two-year term of employment expired, but for the company's breach.

The contracts at issue in the case *sub judice* did not guarantee the Former Employees rights comparable to those held by Mr. Scully. First, unlike the definite-term contract at issue in **Scully**, the Employment Agreements here unequivocally defined the employment as at-will. Sigmapharm did not breach its contracts with the Former Employees through the act of terminating them, as it had the right, upon providing either thirty-days' notice or thirty-days' salary,[35] to end the at-will relationship at any time "for any or no reason." **Brader v. Allegheny Health Network**, 349 A.3d 210, 224 (Pa.Super. 2025) (cleaned up). Second, units in Sigmapharm were not available on the open market to have been purchased by the Former Employees in lieu of the ones to which their contracts entitled them.[36] Third, and most significant, the Former Employees had no contractual rights either

---

[35] **See**, **e.g.**, Exhibit P-1 (Grover's Employment Agreement) at § 7(a).

[36] On the contrary, Sigmapharm units were subject to restrictions on transfer, and could be purchased only in certain circumstances by the primary voting member or the company itself based upon the adjusted net book value of Sigmapharm on the date of dissociation. **See** Operating Agreement at Article XI.

to cash out the value of their units or to continue to hold all of them post-termination. *Cf. Viener v. Jacobs*, 834 A.2d 546, 558 (Pa.Super. 2003) (affirming award of market value of shares in closely-held corporation where the shareholder agreement guaranteed a right to sell shares to the other shareholders but "was silent regarding situations in which a shareholder was terminated involuntarily").

As we outlined *supra*, the Employment Agreements governed the Former Employees' rights to retain and transfer their units and referred to the Operating Agreement for the company's right to repurchase them. Specifically, § 9 of the Employment Agreements of most of the Former Employees provided as follows, in relevant part, concerning equity compensation:

> (b) If this Agreement is terminated for cause pursuant to [§] 7(c) hereof or if Employee after termination of this Agreement is deemed by Employer in its reasonable discretion that he has violated [§§] 5, 6 or 8 hereof (the "Determination of Covenant Violation"), any units which have been issued to Employee under [§] 4 or [§] 9(c) hereof shall be transferred automatically to Employer for $1.00. . . .

> (c) The termination of this Agreement for any reason other than death, disability, retirement, or cause, shall be referred to as a "Conversion Event." Upon the occurrence of a Conversion Event[,] any Series B units which have been issued to Employee under [§] 4 shall be converted to a number of Series B units (if the termination was initiated by the Employer without cause) or Series D units (if the termination was initiated by the Employee) equal to the Series B units owned by the Employee at the time of the occurrence of the Conversion Event multiplied by a fraction having as numerator the number of years that the Employee worked at the Employer (rounded to the nearest full year) and as denominator the number

20. Any fractional shares resulting from this calculation shall be rounded to the nearest full number. . . .

. . . .

(e) Employer's right to repurchase any Series B units or Series D units which have been issued to Employee under [§] 4 or [§] 9(c) hereof in all circumstances (other than upon termination for cause or upon a Determination of Covenant Violation) shall be set forth in the . . . Operating Agreement.[37]

Exhibit P-1 (Grover Employment Agreement) at § 9 (cleaned up).[38]

Here, Sigmapharm maintained that the Former Employees were terminated pursuant to § 7(c) because they violated their covenants regarding confidentiality, non-competition, and intellectual property rights, and accordingly deemed their units to have automatically transferred back to the company in exchange for $1. However, the jury rejected Sigmapharm's claims for breach of contract premised upon those covenant violations. Consistent with that determination, the jury also found in favor of the Former Employees on their counterclaims against Sigmapharm for breach of the Employment Agreements. In other words, the jury effectively determined that the

_____

[37] Repurchase rights were addressed in ¶¶ 11.7 and 11.8 of the Operating Agreements, and provided that repurchase as a result of a member's dissociation was at the discretion of the primary voting member or the LLC, with the purchase price being determined based on the adjusted net book value of the company. No expert quantified that amount at trial.

[38] Ogunbiyi's Employment Agreement differed in that it called for conversion of his Series B units to Series D units regardless of who initiated the termination. *See* Exhibit P-4 (Ogunbiyi Employment Agreement) at § 9(c).

terminations were at-will pursuant to § 7(a), and not for-cause terminations under § 7(c).

To satisfy the Former Employees' expectation interests, giving them the benefit of their bargains by placing them in the position they would have been in absent the breach that occurred, the jury should have, as Sigmapharm argued, been instructed to "look at the contract and say, 'what does the contract provide[?]'" N.T. Trial, 4/25/24 (A.M.), at 35. Sigmapharm explained:

> [W]hat this really goes to is to the heart that the remedy for breach of contract is putting the claimant back in the position they would have been had there not been a breach.
>
> And, here, the Employment Agreement dictates what happens to shares and how shares can be transferred or, rather, not transferred, and in what events they can be reduced to cash value.
>
> And, here, what is being presented to the jury is essentially a windfall, of whether, assuming *arguendo* that there was a breach, the employees would not have X million dollars in their pocket had there not been a breach.
>
> And this is really going to the heart of how to properly assess damages to the extent they find Sigmapharm breached the contract.
>
> . . . .
>
> [T]he remedy for breach of contract is to put the contracting party back in the position they would have been, which was having units, not liquidating their equity interest and getting X million dollars[.]

*Id*. at 19, 30 (some capitalization altered). ***Accord Snyder v. Crusader Servicing Corp.***, 231 A.3d 20, 29 (Pa.Super. 2020) (collecting cases holding that the rights of an equity-holder in a business are governed foremost by the parties' shareholder or partnership agreements.

Pursuant to the plain language of the Employment Agreement, a § 7(a) at-will termination entitles the employee to thirty-days' salary. It also constitutes a termination for a reason other than death, disability, retirement, or cause, making it a conversion event that renders the provisions of § 9(a) applicable to the employee's equity compensation. Pursuant to that provision, Ogunbiyi's Series B Units would convert to Series D units, and the rest of the Former Employees' Series B units would convert to a calculable number of Series B units. Therefore, the jury should have been tasked with determining damages as the unpaid thirty-days' salary due to each Former Employee, the respective numbers and types of units to which each was entitled pursuant the formula stated in § 9(c), and the amount of distributions of net operating cash flow and net proceeds of capital events, if any, that the converted units would have yielded them since their termination.

Instead of instructing the jury to compensate the Former Employees for these expectation interests derived from the contracts that they signed, the trial court gave their proposed ***Scully*** instruction, effectively telling the jury to vindicate the expectation interests **Mr. Scully** had based upon **his** employment agreement, not the expectation interests of the Former

Employees engendered by their Employment Agreements. The jury dutifully complied, awarding each Former Employee thirty-days salary and, in accordance with the *Scully* instruction, the 2014 value of their units.[39]

Therefore, our review of the record confirms that the trial court abused its discretion by offering inaccurate jury instructions that controlled the outcome of the jury's verdicts as to Sigmapharm's breaches of the Employment Agreements. While we have no cause to disturb the jury's determinations that Sigmapharm's relationships with the Former Employees were governed by the written contracts and that Sigmapharm breached them, we are constrained to vacate the jury's damages awards on this count and remand for a new trial as to the consequential damages flowing from the breaches calculated in accordance with the implicated contract provisions.

In its final issue, Sigmapharm challenges the trial court's failure to mold the WPCL verdict. The Former Employees declined to address this issue in their brief, and the trial court agrees that the jury's finding that Sigmapharm had a good faith basis to contest the wage claims means that "the Former Employees are not entitled to compensation under the WPCL[.]" Trial Court

_____

[39] We reject the Former Employees' argument that the error was harmless because the jury's choice not to ascribe the value to the units suggested by their expert indicates that it did not apply the *Scully* instruction in arriving at its award. The fact that the jury instead utilized the 2014 book value testified to by Sigmapharm's senior finance advisor does not change the fact that it placed the Former Employees in a different position than they would have been in absent the breach in question.

Opinion, 1/3/25, at 37-38. Accordingly, we vacate the judgments against Sigmapharm on the WPCL claims and, as the trial court requested, remand for the appropriate molding of those verdicts. *See* Trial Court Opinion, 1/3/25, at 37-38.

To sum up our rulings on the issues raised in Sigmapharm's appeal, we: (1) affirm the verdict in favor of the Former Employees on Sigmapharm's claim for breach of contract; (2) affirm the jury's determinations that Sigmapharm breached the written contracts, but remand for a new trial on the damages to which the Former Employees are entitled, utilizing jury instructions consistent with this memorandum; (3) vacate the judgment in favor of the Former Employees' claims for breach of oral contract and grant Sigmapharm JNOV as to that count; (4) vacate the judgment and damages awards on the Former Employees' WPCL claims; and (5) affirm in all other respects the verdicts and judgments entered on the other claims litigated between Sigmapharm and the Former Employees.

## III. Spireas's appeal

Spireas presents this Court with the following questions:

1.  (a)  Does a CEO breach a fiduciary duty by terminating non-voting, non-capital contributing members of a Pennsylvania manager-managed [LLC]?

    (b)  Related, did the trial court abuse its discretion in charging the jury with a non-standard minority freeze-out instruction?

2.     (a)     When a CEO acts on behalf of the company, are the acts whereby the company is alleged to have breached its contracts also breaches of a CEO's fiduciary duty?

         (b)     Related, is a trial court authorized to deem the CEO's testimony on behalf of a company that has brought suit to protect its confidential information to have waived a third-party individual defendant's right to testify in his own defense when he alone is accused of breaching a fiduciary duty?

3.     (a)     When a jury finds that the CEO's contract-based acts breached a fiduciary duty but caused no compensable harm, may the jury award punitive damages?

         (b)     In the light of all of the above, was the trial court within its discretion to uphold a $23.5 million punitive-only verdict against an individual, without an award of a new trial or any *remittitur*?

Spireas's brief at 6-7.

In his first four intertwined issues, Spireas challenges whether the facts of the case support a finding that he breached a duty he personally owed to the Former Employees that was distinct from Sigmapharm's contractual obligations that were breached through the actions Spireas took in his role as an officer of the company. To that end, he also queries whether the trial court's conflation of the company and its officer led to the denial of Spireas's right to defend the claims against him as an individual.

We first consider whether Spireas was in a fiduciary relationship with the Former Employees. Our Supreme Court has explained that, "[i]n some types of relationships, a fiduciary duty exists as a matter of law. Principal and

agent, trustee and *cestui que* trust, attorney and client, guardian and ward, and partners are recognized examples." ***Yenchi v. Ameriprise Fin., Inc.***, 161 A.3d 811, 820 (Pa. 2017) (citations omitted). "Where no fiduciary duty exists as a matter of law, Pennsylvania courts have nevertheless long recognized the existence of confidential relationships in circumstances where equity compels that we do so." ***Id***. (citations omitted).

Spireas first argues that he is entitled to JNOV on the claims for breach of fiduciary duty because he neither stood in a fiduciary relationship with the Former Employees as a matter of law nor under the particular facts of the case. We begin our analysis by reviewing the Former Employees' theory of the case presented to the jury for Spireas's breach of fiduciary duty.

At the start of trial, counsel for Grover introduced the claim by asserting that "partners have a fiduciary duty to each other, . . . to treat each other with integrity." N.T. Trial, 4/9/24 (A.M.), at 108. Counsel asserted that Spireas used his control over Sigmapharm to satisfy his own greed, and that the Former Employees' requests for access to information and some control over company expenditures was "kryptonite to [Spireas]" which threatened to expose and curtail his self-dealing. ***Id***. at 108-09. Grover's counsel cited the millions of dollars in interest Spireas received from Sigmapharm for his prime-plus loans, that "he paid himself a hefty salary also in the many hundreds of thousands of dollars" despite rarely appearing at work, and Spireas's "extravagant expenditures of corporate funds" on things such as his fleet of

cars including a Bentley and a Rolls Royce. *Id*. at 88, 105-06, 108. The Former Employees posited that, to maintain this *status quo*, Spireas fabricated the allegation that the Former Employees refused to report to him anymore so he could "get rid of them and keep all of the money" that the company had started to earn due to the Former Employees' efforts. *Id*. at 109 (cleaned up).

The chief evidence the Former Employees presented to substantiate these allegations was the testimony of Grover, who, by virtue of being an officer and manager of Sigmapharm, had the greatest knowledge of Spireas utilizing his control over the company's affairs to further his personal interests. The testimony, recounted in greater detail *supra* on pages 34-36, included the matters referenced in the opening statements, but further included additional assertions that Spireas used Sigmapharm's resources to bully or punish employees, sent company money to Spireas's brother and various Greek organizations, and even used a company card to buy diamonds. Spireas's use of his control of Sigmapharm in this manner caused the Former Employees to fear that they "would never make a dollar" from their minority interests in the company. *See* N.T. Trial, 4/16/24, at 90.

In closing arguments, the Former Employees' attorneys maintained that Spireas breached his fiduciary duty by "[m]aking decisions that [we]re motivated by self-interest and spite." N.T. Trial, 4/24/24, at 221. The jury was reminded of Spireas's actions in fighting workers' and unemployment

compensation claims, and his "disgusting" use of threats to bully Mr. Goldberg. *Id*. at 223-24. The Former Employees cited the controlling membership interests Spireas and his wife held in Sigmapharm, leading to their being the "managers and decision-makers." *Id*. at 191. Using that power, "[t]hey kicked [the Former Employees] out without notice and took their stock back, pulled the rug out from under them for a bogus reason." *Id*. at 192.

Spireas first asserts that the facts do not establish a fiduciary relationship with any Former Employee by virtue of a confidential relationship, and we agree.[40] The fact-specific existence of a confidential relationship giving rise to a fiduciary "usually involve[s] some special vulnerability in one person that creates a unique opportunity for another person to take advantage to their benefit." *Yenchi*, 161 A.3d at 821. These confidential relationships are "characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side, which results in the effective ceding of control over decision-making by the party whose property is being taken." *Id*. at 823 (cleaned up).

_____

[40] As our summary of their closing arguments suggests, the Former Employees did not advance the existence of a confidential relationship as the source of Spireas's fiduciary duty. They advocate for that basis on appeal only in a single-sentence footnote that cites a factually-dissimilar case. *See* Former Employees' brief at 34 n.5 (citing *Basile v. H & R Block, Inc.*, 777 A.2d 95, 106 (Pa.Super. 2001) (reversing grant of summary judgment where the plaintiff's evidence showed that the defendant knowingly exploited its customers' "pronounced intellectual and economic weakness" and abused their trust for the defendants' financial gain)).

Here, Spireas never served as professor or supervisor to Ogunbiyi, who was of a similar age to Spireas and was VP of his own department at Mutual. While Spireas had taught, mentored, and supervised the rest of the Former Employees at LIU in the 1990s and later at Mutual, by the time they chose to join Spireas at Sigmapharm they were all adults with established careers. There is a dearth of evidence suggesting that any Former Employee had a special vulnerability that Spireas took advantage of to exert overmastering influence over his or her decisions. Nor do the facts suggest that the Former Employees justifiably trusted him so much that they effectively ceded to him control over their decision to join or remain at Sigmapharm, a move that the jury concluded Spireas did not fraudulently induce.

Thus, Spireas is entitled to JNOV on the fiduciary duty claims unless he was a fiduciary as a matter of law. He argues he was not because the Pennsylvania LLC enactment in place at the time ("the 1994 law")[41] only imposed a fiduciary duty on him owed to the company, not one due to its members. *See* Spireas's brief at 33. In particular, § 8943 of the 1994 law stated as follows concerning the duties of managers and members of LLCs:

> **(a) Companies without managers.--**If the certificate of organization does not provide that the [LLC] shall be managed by managers, every member must account to the company for any benefit and hold as trustee for it any profits derived by him without

---

[41] The 1994 law was replaced after the events of the instant case by the Pennsylvania Uniform Limited Liability Company Act of 2016, 15 Pa.C.S. §§ 8811–8898.

the consent of the other members from any transaction connected with the organization, conduct or winding up of the company or any use by him of its property. This subsection may not be varied by any provision of the certificate of organization or operating agreement.

**(b) Companies with managers.--**If the certificate of organization provides that the company shall be managed by one or more managers:

(1) [Provisions of the Associations Code regarding domestic business corporations, including directors' fiduciary relation to the company,] shall be applicable to representatives of the company. A written provision of the operating agreement may increase, but not relax, the duties of representatives of the company to its members under those sections. For purposes of applying the provisions of those sections, references to the "articles of incorporation," "bylaws," "directors" and "shareholders" shall mean the certificate of organization, operating agreement, managers and members, respectively.

(2) A member who is not a manager shall have no duties to the company or to the other members solely by reason of acting in his capacity as a member.

15 Pa.C.S. § 8943 (effective August 21, 2001, to February 20, 2017). He insists that the duties purportedly imposed upon him in his capacity as a member of manager-managed Sigmapharm only existed for members of member-managed LLCs and general partnerships. *Id*. at 34.

The Former Employees contend that Spireas incorrectly interprets § 8943. They maintain that this provision of the 1994 law did not "supplant or preempt his common law fiduciary duties as a controlling member of Sigmapharm to minority members." Former Employees' brief at 31. Citing this Court's decision in ***Retina Associates of Greater Philadelphia, Ltd. v.***

***Retinovitreous Associates, Ltd.***, 176 A.3d 263 (Pa.Super. 2017), the Former Employees argue that the duty of controlling members of all LLCs, like majority shareholders in closely-held corporations, had a duty under the 1994 law to refrain from oppressing and freezing out minority members. ***See*** Former Employees' brief at 31.

In ***Retina Associates***, the minority members of an LLC brought a claim for breach of fiduciary duty against a group of members, some but not all of whom were managers, who in the aggregate owned a majority of the company. The minority members alleged that the majority oppressed them and froze them out by adopting a resolution to sell most of the company assets at a price below market value to another entity the majority members owned and then dissolving the LLC. The minority members contended this act of self-dealing and exclusion of the minority from their fair share of the benefits of the LLC was an actionable breach of the majority members' duties to them. However, the trial court sustained preliminary objections, ruling that, pursuant to § 8493(b)(2), the majority members had no duties to the other members.

On appeal, this Court applied the rules of statutory construction to § 8493(b)(2) and reversed the trial court's ruling. At the outset, we found the language ambiguous, explaining:

> The provision states that a member who is not a manager "shall have no duties . . . to the other members **solely by reason of acting in his capacity as a member**." 15 Pa.C.S. § 8943(b)(2) (emphasis added). The provision thus suggests that the mere fact that a member acts as a member of the company is not a sufficient

basis upon which to make that member liable to other members. The word "solely" further suggests, however, that a member may have duties to other members if the member is held to account for reasons other than or in addition to his mere status as a member of the company. The provision does not explain what situations would give rise to such duties, leaving it to the courts to fill in this gap in the statute.

*Retina Associates*, 176 A.3d at 274.

Accordingly, we looked to the statute's comments to resolve the ambiguity, specifically the following:

Subsection (b)(2) makes clear that members who do not act as managers, like corporate shareholders and limited partners, do not have the fiduciary duties of managers. Even if a member is not involved in management, however, the member has no right to appropriate for personal use property belonging to the company. It is intended that the courts will fashion rules in appropriate circumstances by analogy to principles of corporate or partnership law to deal with situations such as oppression of minority members, actions taken in bad faith, etc. *See* 15 Pa.C.S. § 110.

*Id*. at 273 (quoting 15 Pa.C.S. § 8943 at Committee Cmt.—2001). Not only was § 110 referenced in this comment, but also in 15 Pa.C.S. § 8904(b) (effective until February 20, 2017), which set forth that, "[e]xcept as otherwise provided in [§] 110 (relating to supplementary general principles of law applicable), the liability of members, managers[,] and employees of a company shall at all times be determined solely and exclusively by the provisions of [the 1994 law]." *See Retina Associates*, 176 A.3d at 273 n.8.

Thus, the provisions of § 110 of the Associations Code supplemented the liability of members of LLCs, member-managed and manager-managed

alike. Specifically, § 110 retained application of "the principles of law and equity, including, but not limited to, the law relating to principal and agent, estoppel, waiver, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause, shall supplement its provisions," unless displaced by particular provisions of the Associations Code. *Id*. (quoting 15 Pa.C.S. § 110). As such, longstanding precedent concerning the duties of majority stakeholders in corporations, limited partnerships, and joint ventures applied to majority members in manager-managed LLCs notwithstanding the language of § 8943(b)(2). *Id*. at 276-77 (collecting cases).

Relevant to our discussion, the recognized duties included a prohibition against majority owners "using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise."[42] ***Ferber v. Am. Lamp Corp.***, 469 A.2d 1046, 1050 (Pa. 1983) (cleaned up). This "freezing out of minority holders with the purpose of continuing the business for the benefit of the majority holders is a violation of the fiduciary duty owed to minority shareholders by the majority

_____

[42] The comments to the prototype act upon which the 1994 LLC law was based also included the duties of even members not involved in management to refrain from "appropriat[ing] for personal use property belonging to the LLC" or "expel[ling] a member solely or primarily in order to appropriate the value of the member's interest." ***Retina Associates***, 176 A.3d at 274–75 (cleaned up).

shareholder[.]" *In re Jones & Laughlin Steel Corp.*, 412 A.2d 1099, 1103 (Pa. 1980) (cleaned up).

The term "freeze-out" or "squeeze-out" means "the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants." *Linde v. Linde*, 220 A.3d 1119, 1141–42 (Pa.Super. 2019) (cleaned up). As this Court observed in *Retina Associates*, additional ways minority owners are vulnerable to oppression includes the following:

> The squeezers (those who employ the freeze-out techniques) may refuse to declare dividends; they may drain off the corporation's earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps to their relatives, or in the form of high rent by the corporation for property leased from majority shareholders; they may deprive minority shareholders of corporate offices and of employment by the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders. In particular, the power of the board of directors, controlled by the majority, to declare or withhold dividends and to deny the minority employment is easily converted to a device to disadvantage minority stockholders.

*Retina Associates*, 176 A.3d at 275-76 (cleaned up). With these actions, the majority owners deny "fair payment to the squeezees for the interests, rights, or powers which they lose." *Linde*, 220 A.3d at 1142 (cleaned up).

In light of this precedent, we agree with the trial court that, as a matter of law, Spireas had a fiduciary duty, as the member holding 90% of the voting units, not to use his control of Sigmapharm to deprive the Former Employees

of their shares of the benefits accruing from the company. *See* Trial Court Opinion, 1/3/25, at 33-34. Further, contrary to Spireas's contentions otherwise, the trial court's minority-oppression jury instruction accurately communicated this law to the jury.[43]

We also concur with the court and the Former Employees that the jury had sufficient evidence to conclude that Spireas violated his fiduciary duty by committing several of the archetypal acts noted above, such as draining off Sigmapharm's earnings through personal purchases and payments to family,

_____

[43] The charge that Spireas challenges was as follows:

> An attempt by majority shareholders to freeze out minority shareholders to continue the enterprise for the benefit of the majority shareholder is a breach of the majority shareholder['s] fiduciary duty to the minority shareholders. The freeze-out occurs when a majority shareholder uses a strategic position, inside information or power of control or utilization of some legal device or technique to eliminate, from the enterprise, one or more of the owners or participants.
>
> The victim of an unlawful freeze-out typically does not obtain a fair payment for their interest or the enterprise. Shareholder oppression can take many forms, and the tactics employed against the minority shareholder to the effect of such freeze-out include, but are not limited to general oppressive conduct, to withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority shareholders, withholding information related to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholder's appraisal rights, failure to hold meetings and exclude the minority from a meaningful role in the corporation decision-making.

N.T. Trial, 4/25/24 (A.M.), at 122-24.

collecting high interest on his loans to the company while not paying down the principal, and, ultimately, denying the Former Employees employment as a pretext to appropriate the value of their units. *See* Former Employees' brief at 39.

Moreover, we find no merit in Spireas's argument that he is entitled to JNOV on the basis that the fiduciary duty claim was barred by the gist-of-the-action doctrine. *See* Spireas's brief at 44-45 (citing a common pleas court decision under Delaware law for the proposition that "[a] claim for breach of fiduciary duty may not be maintained simultaneously with a claim for breach of contract, if both claims hinge on the same underlying facts.").

The gist-of-the-action doctrine acts to bar tort claims, such as those for breach of fiduciary duty:

> (1) arising solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; or (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

*B.G. Balmer & Co., Inc. v. Frank Crystal & Co., Inc.*, 148 A.3d 454, 469 (Pa.Super. 2016) (cleaned up, opening parentheses added). This Court has held that, where "the contract creates a relationship that in turn implies a common-law duty, the contract is collateral to that common-law duty, and the gist-of-the-action doctrine does not apply." *Bert Co. v. Turk*, 257 A.3d 93, 110 (Pa.Super. 2021), *review granted on other grounds and aff'd*, 298 A.3d

44 (Pa. 2023). Even when the same act breaches both a contractual obligation and a societally-imposed general duty of care, a litigant may elect to pursue claims for both, so long as there is no double recovery. *See Swatt v. Nottingham Vill*., 342 A.3d 23, 52 (Pa.Super. 2025) (*en banc*).

Our examination of the law governing the Former Employees' fiduciary duty claims makes it plain that the duty at issue did not arise from the parties' contract and that Spireas's breach inflicted harms distinct from the breaches of contract. As was covered in our disposition of Sigmapharm's appeal, Spireas's act as manager and CEO of Sigmapharm of terminating the Former Employees was not a breach of contract. The company had the right to end the at-will relationship at that time. The breach was in deeming their firings as for-cause in the absence of wrongdoing to trigger for-cause terminations and reclaiming their units rather than considering it a conversion event. *See supra* at pages 74-77.

On the other hand, the trial evidence that supports the finding that Spireas breached his fiduciary duty included the use of his power as Sigmapharm's controlling member: (1) to take money out of the company for his own benefit rather than distributing it to all members in accordance with their ownership interests; (2) to remove Grover from the board of managers when he challenged Spireas about the practices; (3) to terminate the Former Employees once their work began generating substantial profit so he would not have to share it with them; and (4) to fabricate for-cause

circumstances so he could reclaim their units for $1 rather than purchasing them based on the company's adjusted net book value pursuant the Operating Agreement. These breached obligations were, as the trial court aptly held, "not based on contract, but as a matter of social policy." Trial Court Opinion, 1/3/25, at 42 (cleaned up).

Moreover, the damages flowing from the fiduciary breaches are not coextensive with what the terms of the contract provided, *i.e.*, thirty-days' salary and right to hold converted company units. Instead, for the fiduciary breaches, the Former Employees may recover additional sums representing the benefits that did not flow to them due to Spireas's freeze-out, such as distributions of net operating cash flow that would have existed but for Spireas's draining money from the company through his self-dealing and the value of the units they lost by virtue of the conversion fraction.[44, 45]

---

[44] As these distinctions establish, no double-recovery is created and there is no merit to Spireas's lament that a majority member now cannot terminate an at-will minority-member employee without breaching a fiduciary duty. **See** Spireas's brief at 38. Instead, our holdings merely confirm that: (1) a company breaches its contract by imposing for-cause consequences upon the termination of an at-will employee where the contract allows for-cause termination in only certain defined circumstances that did not exist; and (2) a controlling member of a manager-managed LLC breaches a fiduciary duty to a minority member when he engages in self-dealing or other forms of minority oppression, regardless of whether at-will employment or termination are involved.

[45] For example, Sagi was employed at Sigmapharm for eight years, from September 2006 to September 2014. Pursuant to § 9(c) of his Employment
*(Footnote Continued Next Page)*

Thus, Spireas has failed to convince us that he is entitled to judgment as a matter of law on the Former Employees' fiduciary duty claims. We therefore have no cause to disturb the jury's liability findings against Spireas on these claims.

Spireas argues that if he is not entitled to JNOV on the fiduciary duty claims, he at least is entitled to a new trial because the trial court, blurring the distinction between him and Sigmapharm, deprived him of the due process right to present his individual defense.

This Court has summarized the applicable law as follows:

> [A] question regarding whether a due process violation occurred is a question of law for which our standard of review is *de novo* and the scope of review is plenary. Furthermore, it is well settled that procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. Due process is flexible and calls for such procedural protections as the situation demands.

*Meyer v. Chisom*, 347 A.3d 89, 94 (Pa.Super. 2025) (cleaned up).

Spireas argues that his due process rights were violated by the trial court's refusal to permit him to take the stand after Grover's testimony in furtherance of the fiduciary duty claims against Spireas. He asserts that, from

_____

Agreement, the at-will termination resulted in the application of an 8/20 fraction to convert his 100,000 Series B units into 40,000 Series B units, units to which he is entitled as damages of Sigmapharm's breach of contract. Arguably, Spireas's freeze-out-motivated termination of Sagi would entitle him to the value of the 60,000 units that Spireas appropriated from him by breaching his fiduciary duty.

his perspective as a third-party defendant, he was not "required to respond to evidence about a breach of fiduciary duty before any [wa]s presented," and his counsel had no cause to anticipate "that a judge would not allow his client to defend himself, much less consider the right relinquished." Spireas's brief at 45-46.

The trial court suggests that Spireas waived this issue because his "counsel never made an objection or argument that attempted to either (1) limit the questioning of . . . Spireas to his capacity as a corporate officer or (2) limit the scope of the cross-examination of Spireas, which addressed the counterclaims." Trial Court Opinion, 1/3/25, at 47.

We find no waiver. Nothing in the certified record suggests to us that Spireas had reason to proactively request to limit his testimony to his capacity as Sigmapharm's representative. Sigmapharm presented its evidence first because it was the one and only plaintiff in the case and Spireas testified as Sigmapharm's corporate representative to prove Sigmapharm's claims against the Former Employees founded upon their alleged breaches of their fiduciary duties to the company. In order for waiver to be apt, there would have to be some indication in the record that Spireas was on notice that he was required to anticipatorily defend himself against the Former Employees' claims of financial improprieties, threats, and bullying before he heard the evidence substantiating them, rather than being permitted to retake the stand after the Former Employees' rested their case against him to respond to their evidence.

Further, Spireas had no cause to object to the cross-examination regarding the reasons Sigmapharm terminated the Former Employees, as they had mirror-image breach-of-contract counterclaims against the company regarding the termination. Delving into whether the terminations were properly deemed by Sigmapharm to be for-cause related to both the Former Employees' defense of Sigmapharm's claims and their counterclaims against the company.

With waiver rejected as a basis to affirm the trial court's denial of a new trial, we consider the trial court's alternative opinion that "Spireas's proposed testimony was redundant and improper as rebuttal evidence." *Id*. at 48. The court asserts that Spireas had the opportunity to address on re-direct during Sigmapharm's case any "allegations, issues, or points that had arisen during cross-examination" by the Former Employees' counsel concerning "the reasons he fired the Former Employees and took back their shares[.]" *Id*. at 50. The court further opines that, from opening arguments and the fact that Sigmapharm called all the Former Employees to testify in its case-in-chief, "it was clear that Spireas knew that his purported reasons and alleged justification for terminating the Former Employees was at issue in the case." *Id*. at 49.

We agree with Spireas that the court's improper-rebuttal rationale is premised on a mischaracterization of Spireas as interchangeable with Sigmapharm as a plaintiff and counter-claim defendant. *See* Spireas's brief

at 46-47. Despite the court's suggestions to the contrary, Spireas was neither a plaintiff with a case-in-chief to present nor a counter-claim defendant.[46] He was in the case solely as a third-party defendant and, therefore, had no case to present and none to defend until the Former Employees presented their claims against him personally. As such, Spireas's taking the stand to testify after the Former Employees offered their evidence would not have been rebuttal or what the court characterized as giving Sigmapharm and Spireas "another opportunity to present your case." N.T. Trial, 4/18/24, at 283.

Further, the court's indications during trial and on appeal that Spireas had sufficient motive and opportunity to offer his personal defense during Sigmapharm's case-in-chief are not supported by the certified record. It is true that counsel for the Former Employees outlined the evidence they intended to present to demonstrate Spireas's breach of fiduciary duty. However, counsel's opening did not detail the "the real personal, egregious, defamatory attacks . . . leveled against him[,]" *id*. at 277, such as Spireas's antisemitic comment, his payments to Greek organizations and his brother, having his home builder as a Sigmapharm vendor, or his purchase of diamonds with company funds. After the Former Employees introduced that

---

[46] *See*, *e.g.*, N.T. Trial 4/10/24 (A.M.), at 27 (referencing "each individual Plaintiff"); 4/15/24, at 29-30 (explaining to the jury that Grover would be first called by Sigmapharm as on cross-examination and then would be permitted to testify about his claims "against the Plaintiff himself and the company").

evidence in their role as plaintiffs, Spireas had a right to respond to it.[47]

***Accord Risperdal Litig. W.C. v. Janssen Pharm., Inc.***, 174 A.3d 1110, 1120 (Pa.Super. 2017) ("[I]n situations where a plaintiff introduces certain evidence in his case in chief, he cannot later bar the opposition from disputing it.").

One matter pertinent to the minority freeze-out aspect of the fiduciary duty claim mentioned by counsel during opening statements was that Spireas reaped interest repayments from the company and "paid himself a hefty salary also in the many hundreds of thousands of dollars." See N.T. Trial, 4/9/24 (A.M.), at 106. However, when Sigmapharm's counsel proactively asked

---

[47] The trial court and the Former Employees correctly highlight that Spireas offered only limited oral offers of proof concerning what testimony he would offer if permitted to re-take the stand, focusing primarily on Grover's accusation regarding Mr. Goldberg, and did not bring the more extensive written proffer to the court's attention before evidence closed. ***See*** Trial Court Opinion, 1/3/25, at 52-56; Former Employees' brief at 54-57. The trial court nonetheless opines that he was properly denied the chance to address the additional topics of responding to: "(1) the testimony that Spireas was litigious and used litigation to terrorize Sigmapharm employees; (2) the testimony that Spireas was wealthy and stealing from Sigmapharm to fund private activities; and (3) the testimony that Sigmapharm does not honor his agreements," because "these issues were not litigated in a timely manner," and counsel "failed to extensively cross-examine or re-direct the Former Employees about any of these issues, despite having ample opportunity to do so." ***See*** Trial Court Opinion, 1/3/25, at 56 n. 198. These justifications are patently premised and dependent upon the continued mischaracterization of Spireas as a litigant who had a case-in-chief and now sought to augment it rather than appreciating that Spireas had yet been afforded the opportunity to respond to the evidence that had been presented against him as a third-party defendant.

Spireas during his testimony as CEO of Sigmapharm if he took a salary from the company every year, Grover's counsel raised a relevance objection which the court immediately sustained. *See* N.T. Trial, 4/10/24 (A.M.), at 40-41. The court's ruling remained the same after Sigmapharm's counsel responded "I think he made it relevant in his opening." *Id*. at 41. Thus, it seems that Spireas was damned if he did and damned if he did not.

Given this certified record, we are constrained to conclude that the trial court's refusal to allow Spireas to respond to the evidence offered against him as an individual third-party defendant deprived him of his core due process rights to an opportunity to be heard and a chance to defend himself. Therefore, we hold that Spireas is entitled to a new trial on the Former Employees' claim of breach of fiduciary duty.[48] *Accord Meyer*, 347 A.3d at 95 (vacating determination based upon proceeding in which the appellant's role and right to participate was unclear and remanding for a new hearing at which the appellant was permitted "to fully participate as a party in interest").

To recap our rulings on the issues raised in Spireas's appeal, we are unpersuaded that the evidence proffered by the Former Employees was insufficient to establish that Spireas, as the controlling member of Sigmapharm, had a fiduciary duty not to abuse his power to the detriment of

---

[48] Our grant of a new trial moots Spireas's remaining issues challenging the propriety and amount of the jury's award of punitive damages for his fiduciary duty breach.

the minority members.  We are likewise unpersuaded that the Former Employees did not adduce sufficient evidence to prove that he breached that duty by terminating them and taking their units to avoid sharing the company's increasing profits.  However, the notes of testimony from the trial confirm Spireas's contentions that the court failed to honor his fundamental right to defend the case that was presented against him.  Therefore, we vacate the judgments and verdicts against Spireas for breach of fiduciary duty and remand for a new trial on that count only.  Since we have no cause to disturb the judgments in favor of Spireas on the Former Employees' claims of fraudulent inducement and violation of the WPCL, they are affirmed.

## IV.   Conclusion

For the reasons stated above, in Sigmapharm's appeal at 3116 EDA 2024, we:   (1) reverse the trial court's denial of JNOV on the Former Employees' claims for breach of oral contract and remand for entry of judgment in favor of Sigmapharm on that count; (2) vacate the judgments against Sigmapharm for breach of written contract, affirm the jury's finding of liability, and remand for a new trial solely on the damages flowing from the breach; (3) remand for the trial court to enter a molded verdict on the WPCL claim following the damages retrial; and (4) affirm the remaining judgments on the claims between Sigmapharm and the Former Employees.

In Spireas's appeal at 3117 EDA 2024, we:   (1) vacate the judgment and verdicts against him for breach of fiduciary duty and remand for a new

trial on that claim; and (2) affirm the judgments in favor of Spireas on the remaining claims against him.

Judgments affirmed in part, reversed in part, and vacated in part. Cases remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/3/2026